### JOE BALESTRIERI & CO. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 12102.

United States Court of Appeals
Ninth Circuit.

Nov. 15, 1949.

Louis Janin, Harold E. Haven, William B. Acton, San Francisco, Cal., for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Helen Goodner and Edward J. P. Zimmerman, Sp. Assts. to the Atty. Gen., for respondent.

Before POPE, Circuit Judge, and LING and DRIVER, District Judges.

DRIVER, District Judge.

The Tax Court of the United States determined a deficiency in the excess profits tax of petitioner for the year 1943, based upon the disallowance of a deduction claimed by the taxpayer in the amount of $22,229.37. The principal question presented here is whether the deduction should have been allowed.

Petitioner, a California corporation, filed its income and excess profits tax returns on a cash basis for the calendar year 1943. Its stock was then owned by Joe Balestrieri and W. E. Otto.[1] The former was the president and the latter the vice-president and both were members of the board of directors. The corporation was then successfully engaged in the wholesale fish business.

In the early summer of the year 1943 J. F. Hoff, a mining engineer, persuaded Balestrieri and Otto that large profits could be made in the mining and milling of chrome ore in California, and as a result, on July 1st the three individuals formed a co-partnership under the name of Strategic Minerals Exporation Company. The articles of co-partnership provided that Hoff was to devote his full time to the business, the other two partners were to defray certain expenses, and the net profits were to be shared equally.

Otto endeavored to secure the necessary financial backing for the partnership from the Pacific Vegetable Oil Corporation (hereinafter called Pacific). After a conversation with its president, B. T. Rocca, Otto wrote a letter to Pacific on July 23rd outlining in detail a proposal that the partnership buy chrome ore, mill and ship it to "the Metals Reserve stockpile at Sacramento" and that Pacific advance "against invoices" the necessary funds to finance the operation. In return Pacific was to receive 25 per cent of the net earnings until its financial assistance was no longer re-

---

1. Some shares were held by members of their immediate families but the two individuals named were in complete control of the corporation.

quired, when it would receive 10 per cent "for the duration * * *." Otto appended to the letter the following postscript: "P. S. I neglected to insert above, that should our operations be so unfortunate as to result in a loss, no part of this loss will be for your account, but will be taken care of in its entirety by J. M. Hoff, Joe Balestrieri and W. E. Otto."

Rocca, however, was unwilling to make the advances on the credit of the three partners. He informed Otto that he would not accept the proposal unless the petitioner could be induced to have its "Board of Directors agree to underwrite or absorb any loss that might occur."

After discussing the situation with Balestrieri, Otto, acting for the partnership, wrote petitioner a letter dated July 24th in which he referred to his letter to Pacific, "attached hereto," and offered petitioner one-half of any profits the partnership "may earn" in consideration of an agreement by petitioner "to guarantee the payment of any losses or deficits that may occur on money borrowed from Pacific Vegetable Oil Corporation on our chrome milling venture."

At Otto's suggestion, the directors of petitioner "consisting of Balestrieri and Otto" met on July 26th and accepted the offer of the partnership. On the same day petitioner, by its president, Balestrieri, wrote the partnership the following letter:

"July 26, 1943
"Strategic Mineral Exploration Co.
225 California Street
San Francisco, California
Gentlemen:

This is to acknowledge receipt of your offer of July 24 for our participation in your Chrome Milling venture as (sic) Castella, California, all in accordance of

letter written to Pacific Vegetable Oil Corporation as of your letter of July 23rd, 1943. Please be advised that we herewith accept this proposal of yours to participate in the profits of your chrome milling operation and we in turn guarantee any losses should they occur. The Board of Directors this day have had a meeting and all the above has been confirmed by them.

> Yours very truly,
> Joe Balestrieri & Co.
> Joe Balestrieri,
> President."

Pacific then proceeded to finance the partnership's undertaking by advancing money on the security of assigned chrome ore invoices. After about ninety days it became apparent that the venture was a losing one and operations were suspended. By that time the partnership losses amounted to about $39,000. The petitioner paid the balance due Pacific on its advances in the sum of $22,229.37 (the exact amount deducted by petitioner as a loss in its tax return) and Otto and Balestrieri paid the rest of the partnership losses. Hoff, the third partner, "walked out on" them and did not·pay any part of the losses. In November, 1943, petitioner gave its note to Pacific in the amount owing to the latter but the note was not paid until the following year.

The Tax Court concluded that petitioner was a guarantor of the partnership account with Pacific and that it did not suffer any deductible loss in the year 1943.

■ It was not only established by undisputed evidence, but was conceded by petitioner's counsel at the trial that when petitioner made its tax return for the calendar year 1943 it was on a cash basis of accounting.[2] The giving of a note by a

2. The tax return stated that the taxpayer's books .were kept on a cash basis. At the close of the testimony before the Tax Court the following colloquy between the Court and petitioner's counsel took place: The Court: "I think I should state to counsel in order that there be no misunderstanding as to proof that I will take it for the purposes of this case that the petitioner corporation is on a cash

basis of accounting, and that it executed its note to the Pacific Vegetable Oil Company in November 1943 calling for the payment of $22,229.37, and that payments were made on that obligation in 1944 in weekly amounts, and the payments were not begun until 1944 and were not completed until 1944." Mr. Janin: "Certainly we have not proved any payments in 1943, your Honor. Whether there

cash basis taxpayer in the discharge of a secondary liability is not equivalent to a cash payment. Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911; Helvering v. Price, 309 U.S. 409, 60 S.Ct. 673, 84 L.Ed. 836. In order to justify the deduction claimed, petitioner must show that it actually suffered a loss in the taxable year. It contends that it engaged in a joint adventure with the partnership in the milling of chrome ore; that by the terms of the joint adventure agreement petitioner was to pay all losses of the milling operations; that its loss in the year 1943 as such joint adventurer was the amount due Pacific for its unpaid advances; and that petitioner was entitled to deduct the loss in its tax return for that year under applicable federal tax laws.[3]

Both petitioner and respondent assume, and rightly so, that California law governs as to the meaning and effect of the agreement above outlined since the contract was made in California and was to be performed and was wholly performed in that state. The courts of California, in common with other courts, have not precisely defined the term "joint adventure", but they have prescribed what are to be regarded generally as its essential elements. Beck v. Cagle, Cal.App., 115 P.2d 613.[4] Actual joint control, or at least the right of joint control of the common enterprise is an essential element of joint adventure in California. Howard v. Societa Di Unione E. Beneficenza Italiana, 62 Cal. App.2d 842, 145 P.2d 694; Freedman v. Industrial Accident Commission, Cal.App.,

154 P.2d 922; Wiltsee v. California Employment Commission, Cal.App., 158 P.2d 612; Mazzera v. Wolf, Cal.App., 173 P.2d 44. An arrangement whereby two or more persons share the profits of a common undertaking does not constitute a joint adventure in the absence of power of joint control. United Farmers Ass'n v. Sakioka, 7 Cal.App.2d 559, 46 P.2d 770; Larson v. Lewis-Simas-Jones Co., 29 Cal.App.2d 83, 84 P.2d 296; Enos v. Picacho Gold Mining Co., 56 Cal.App.2d 765, 133 P.2d 663. Where there is no common management and control of the enterprise and the profits are shared only as compensation or interest for the use of money advanced, no joint adventure exists. Spier v. Lang, 4 Cal.2d 711, 53 P.2d 138. The sharing of losses as well as profits has also been regarded as an essential element of joint adventure. Stoddard v. Goldenberg, Cal. App., 119 P.2d 800; Enos v. Picacho Gold Mining Co., supra.

When we apply the foregoing principles to the facts in the instant case it becomes apparent that there was no joint adventure between petitioner corporation and the partnership. There was no provision for the exercise of any control by petitioner over the partnership or its chrome milling venture, and petitioner as a corporation did not participate in the management of such venture. Balestrieri was the directing head of the petitioner corporation (Otto testified at the trial that he was "not active in the management."), and the articles of co-partnership of Strategic Minerals Exploration Co. specified

---

were any, I don't know, but if so, they were trivial." The Tax Court's assumption was not subsequently questioned by the petitioner in its petition for rehearing, its petition for review, or its briefs in this court.

3. 26 U.S.C.A. § 3797 "Definitions
   "(a) * * *
   "(2) Partnership and partner. The term 'partnership' includes * * * joint venture * * * and the term 'partner' includes a member in such a * * * joint venture."
   26 U.S.C.A. § 182 "Tax of partners. In computing the net income of each partner, he shall include, whether or not distribution is made to him—

* * * * * * *

(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b)."
   Section 183(b) provided for computation of "ordinary net income" or "ordinary net loss".

4. In the cited case the essential elements of a joint adventure are said to be (a) a community of interest in the object of the undertaking, (b) an equal right to direct and govern the conduct of each other with respect thereto, (c) a sharing of the losses, if any, and (d) close and even fiduciary relationship between the parties.

that Hoff was to carry on and conduct its operations with the provision that he was not to make "any agreement binding upon the partners" without the consent and approval of Otto.

Petitioner argues that there was in practical effect the power of control in the corporation since its two principal stockholders also constituted a majority of the members of the partnership. We cannot accept petitioner's conclusion. The corporation, as such, apart from its stockholders, had no power to control the partnership or the chrome milling venture. A corporation is a legal entity separate and distinct from its stockholders and the continuity of its existence is not interrupted by changes in stock ownership. If, on the day after the contract with reference to the chrome milling venture was made, Balestrieri and Otto had sold and transferred all of their stock to others not connected with the partnership, the corporation's rights, duties and liabilities under the contract would not have been affected in the least. If, therefore, we disregard, as we should for our present purposes, the fact that Balestrieri and Otto owned the controlling stock, it is clear that petitioner corporation had no right or power of control whatsoever over the partnership's operations.

Moreover, we think that another essential element of joint adventure is lacking, namely, provision for the sharing of losses. Taking the transaction as a whole in its proper setting without too much regard for the literal meaning of the language employed in the various writings mentioned above, it appears that petitioner did not agree to assume the losses of the partnership's venture, but rather the possible losses of Pacific on its advances, and as compensation therefor petitioner was to receive fifty per cent of the profits. Fifty per cent was a liberal allowance to say the least, but it is not difficult to understand why it was so large when we consider that Bales-

trieri and Otto each owned practically a one-half share of the corporation but only a one-third share of the partnership. Pacific, or rather Pacific's demand, was responsible for bringing the corporation into the transaction. Pacific's president, Rocca, demanded as a condition of the advance of funds to the partnership that the corporation "underwrite" repayment. In order to meet that demand the corporation was requested to and did agree to make good "any losses or deficits that may occur on the money borrowed from Pacific * * *." Manifestly, the loss of the venture need not be the same as the loss on money borrowed from Pacific. For example, conceivably the partnership could have bought chrome ore on credit and failed to pay for it and thus incurred indebtedness in addition to its indebtedness to Pacific. Petitioner did not in fact pay all of the losses of the partnership. During its ninety days of operation the partnership suffered losses of approximately $39,000, only $22,229.37 of which was assumed and paid by petitioner.

We do not consider it necessary to determine whether or not petitioner was a guarantor within the strict definition of the term. Prior to the transaction under consideration the distinction between a surety and a guarantor had been abolished by a California statute. Civil Code, § 2787, which defined either of them as one who promises to answer for the debt, default or miscarriage of another. There is an implied promise that the principal debtor will reimburse a guarantor[5] or a surety[6] who has paid the debt to the creditor, and such guarantor or surety has a right of action against the principal for reimbursement.[7] Whatever may have been the exact nature of the relationship of petitioner, the partnership and Pacific, we think the Tax Court was justified in concluding that the primary liability was from the partnership to Pacific; that petitioner was only secondarily liable; and that petitioner had the right to recover from the partnership any amount it

---

5. 24 Am.Jur. 955, Guaranty, § 125; 38 C.J.S., Guaranty, § 111, p. 1298; Ingalls v. Bell, Cal.App., 110 P.2d 1068, 1075.

6. 50 Am.Jur. 1049, Suretyship, § 221; 50 C.J. 247, Principal and Surety, § 399, 2a

(1); W. H. Marston Co. v. Central Alaska Fisheries Co., 201 Cal. 715, 258 P. 933; W. H. Marston Co. v. Kochritz, 109 Cal.App. 331, 293 P. 120, 121.

7. See footnotes 5 and 6.

might be obliged to pay Pacific. Petitioner could not, therefore, properly deduct the amount of its note to Pacific as a bad debt since there is no evidence in the record that the debt became worthless within the taxable year.[8]

Petitioner argues that there could have been no guaranty in the present case for the reason that the promise to pay was made by petitioner to the principal debtor and not to the creditor. As we view the circumstances, however, we consider it more accurate to say that petitioner's promise was made "through" rather than "to" the partnership. The request for the agreement to "underwrite" the loan was made by Pacific, the prospective creditor, to the partnership, the principal, who transmitted the request to petitioner, the guarantor or surety. The latter then made the agreement which was communicated to the creditor by the principal.[9] In legal effect, the transaction was the same as if Otto, acting for the partnership, had taken a copy of his letter to Pacific of July 23, 1943, to petitioner and had secured thereon an endorsement by the petitioner that it would stand good for repayment of any advances made by Pacific, and Otto had then delivered the letter and endorsement to Pacific.

It is not essential to the creation of a guaranty or suretyship relationship that the promise to pay the debt or obligation of another be directed, addressed or delivered by the maker of the promise to any particular creditor or prospective creditor. A proposal to stand as guarantor or surety may be addressed to the general public, such as a general letter of credit, and the guarantor or surety becomes liable to anyone who accepts the proposal and advances money in reliance thereon. 24 Am.Jur. 888, 38 C.J.S., Guaranty, § 7, pages 1141, 1142.

In our consideration of the questions of law presented on the merits we have taken the facts to be as found by the Tax Court for the reason that upon consideration of the entire record it appears to us that the court's findings are supported by substantial evidence and are not clearly erroneous.[10]

Petitioner earnestly argues, however, that the Tax Court refused to accept the uncontradicted testimony of one of its witnesses, W. E. Otto, and that the Court's findings, insofar as they are not in accord with such testimony, should be set aside. At the trial petitioner claimed that the wording of the letters and other writings to which we have referred earlier in this opinion, was ambiguous, and on that theory the court permitted petitioner's witnesses, Otto and Balestrieri, to testify as to the meaning of the language used in the documents as it was understood by the

---

8. 26 U.S.C.A. § 23 "Deductions from gross income. In computing net income there shall be allowed as deductions:
"* * * * * * *
"(k) Bad debts.
"(1) Debts which become worthless within the taxable year; * * *."

9. The agreement of petitioner to save Pacific from loss must have been communicated to the latter as it proceeded to advance money to the partnership without any other security. Mr. Rocca, president of Pacific, did not testify at the trial, but it was stipulated by counsel for both petitioner and respondent that he "would not have made the loan or extended the credit which is under consideration in this case on the individual credit of Mr. Otto and Mr. Balestrieri, but he extended the credit only because he was protected by this guarantee (sic) from the petitioner corporation."

10. As amended by the new Judicial Code, Title 28 U.S.C.A., effective September 1, 1948, Title 26 U.S.C.A. § 1141 (a) provides that United States Courts of Appeal shall have jurisdiction to review decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." The amendment makes applicable to findings of fact of the Tax Court the following portion of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *" See Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 173 F.2d 170, 173.

parties to the transaction. Otto testified that, as so understood, the petitioner had, in effect, agreed to assume and pay all of the losses of the chrome milling venture of the partnership. He also testified that the partnership had two separate and distinct ventures, one for the mining of chrome ore and the other for the milling of the ore, and that the petitioner's agreement to assume the losses referred only to the milling venture. The testimony, as we view it, however, does not come within the familiar rule that uncontradicted testimony must be followed. Otto was an interested witness. He was testifying as to the meaning of the language of documents written five years previously. Much of his testimony was uncorroborated, it was not wholly consistent with itself or with the testimony of Balestrieri, and it was inherently improbable in the light of the circumstances and the situation of the parties as disclosed by other evidence. The testimony is too long to quote in full but we have set out some illustrative excerpts in the margin.[11] The Tax Court did not

11. Testimony of Walter E. Otto
    (Direct Examination)
    "Q. What was the understanding of the parties with respect to the language used in that letter as follows: The consideration for this offer is that your corporation agrees to guarantee the payment for any losses or deficits that may occur on the money borrowed from Pacific Vegetable Oil Corporation on our chrome milling venture.

"A. Well, Mr. Rocca realized that there was no individual in the partnership that could stand behind the money to be advanced.

"Mr. Janin: That is not responsive to the question. Would you read the question? (The question was read by the reporter) Now, the parties are Strategic Mineral Exploration Company and the petitioner corporation, and they are the only parties involved in this communication. A. We offered Joe Balestrieri, the partnership offered Joe Balestrieri and company one-half participation in the earnings of that venture, which we thought was very liberal, and in exchange for that they were to guarantee us for any losses that might occur on the venture.

"Q. What do you mean by the word 'guarantee'? A. Well, if we ran into difficulties and ran into a loss, they would absorb any loss that might occur.

"Q. When you refer to the venture, what do you mean? Do you mean the operations of the partnership? A. Of the partnership. The partnership had two features to it. One was the chrome mill and the other was mining. Our money obtained from Pacific Vegetable Oil was strictly for the milling venture, and that is why it was $22,000, and the balance was on the other end of the venture. We lost.

"Q. In other words, the agreements of the petitioner corporation related only to the milling venture? A. That was the reimbursement, that's right.

\* \* \* \* \* \* \*

"Q. How long did Strategic Mineral Exploration Company remain in existence? A. Well, we started in July, we got running, I guess the beginning of August, we ran about 90 days and then we closed up as rapidly as we could.

"Q. What was the result of the operations during that period? A. Well, in 90 days we lost better than $34,000, and subsequently to that there was another, I imagine from $6,000 to $10,000. We had to pick up stray odds and ends we didn's know of at the time we tried to liquidate.

(Cross Examination)
"Q. In other words, the amount of the loss to be absorbed by the Balestrieri Company was dependent upon the amount shown in the account between the partnership and the Pacific Vegetable Oil Corporation? A. The money was loaned to the partnership, and then in turn was guaranteed by Balestrieri and Company.
\* \* \*"

Testimony of Joseph Balestrieri
(Direct Examination)
"A. They brought me a proposition in to operate this mill. They were out to borrow some money and the way they borrow the money would have to have a guarantee from Joe Balestrieri and Company. I asked the question what will Joe Balestrieri get in return to guarantee this loan. The answer to me, they would give fifty per cent of the profit, if any profits were made. When they made the proposition to me I took the deal on it, and I went on record, borrowed direct, guaranteed the payment any money borrowed for operating the mill, if there was any loss.

"Q. When the venture wound up some 90 days later, what did the petitioner corporation do with respect to the obliga-

err in declining to accept Otto's testimony although no other witness testified directly to the contrary. See Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L. Ed. 501; Greenfeld v. Commissioner of Internal Revenue, 4 Cir., 165 F.2d 318; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 173 F.2d 170, 174.

■ Petitioner also contends that the Tax Court erred in denying its motion for a continuance. In the earlier stages of the proceedings petitioner had been represented by its general counsel and another attorney specially employed to try the case. It was discovered the day before the trial that the latter had not been admitted to practice before the Tax Court. Another qualified attorney was then employed and substituted and the petitioner's request for a continuance was denied. On the trial date the case was not called until 5:30 p. m. and the session lasted only twenty minutes, during which opening statements were made and documentary evidence was introduced without objection. The Court then recessed until the following morning at 9:30. Docket entries of the Tax Court show that the taxpayer's petition was filed on January 6, 1947, and was amended by leave of court on March 21, 1947. The case was set for trial on the San Francisco calendar for November 3, 1947, but was continued to the next calendar on motion of the petitioner. On January 26, 1948, it was again set for hearing at San Francisco on March 22, 1948, and the trial started on that day. We may fairly assume, it would seem, that petitioner's general counsel and the unadmitted tax lawyer had prepared the case for trial, at least to their satisfaction, as the latter answered for petitioner when the trial calendar was called. The attorney who tried the case showed by his opening statement that he understood and had a good grasp of the issues involved, as he clearly stated them as they were presented to the Tax Court and as they have been presented to this court. Moreover, in the session in the late afternoon of March 22 counsel for the respondent made an opening statement in which he fully and fairly stated the respondent's position. Every offer of proof made by the petitioner at the trial was admitted in evidence. We find no indication in the record that the evidence necessary to a determination of the issues was not fully and adequately presented. The case was not argued orally but was submitted on briefs, and petitioner was allowed ten additional days, fifty-five days in all, in which to submit its opening brief. While petitioner's substituted attorney could well have been allowed more time for preparation, it is our conclusion that in view of the circumstances just related the Tax Court did not abuse its discretion in denying petitioner's motion for a continuance and that no prejudice to petitioner resulted from such denial.

The decision of the Tax Court is affirmed.

---

tion of Strategic Minerals Company to Pacific Vegetable Oil Corporation? A. Well, we had about $39 000 loss that came in this venture. $22,000 is to the Pacific Vegetable Oil Company, and the balance was owed to other dealers. So Balestrieri guaranteed to absorb any loss for the Pacific Vegetable Corporation, so Balestrieri Company, he took the loss on themselves, and the loss was took on By W. E. Otto and myself personally. Hoff, he didn't want to have any part of it. So we paid the balance of the bill between the two of us. And I am telling you it was no fun.

   *     *     *     *     *     *

(Cross Examination)

"Q. Will you please state again your understanding of exactly what the corporation was guaranteeing to do under this agreement? A. We were supposed to guarantee any money was borrowed from the PVO, the Pacific Vegetable Oil, Incorporated.

"Q. You were to guarantee they would be paid back? A. They'd be paid back, definitely. In return we were supposed to receive fifty per cent of the profit of this venture which would make me rich overnight. * * *

(Redirect Examination)

"A. Well, my understanding was that we are supposed to guarantee Pacific Vegetable Oil Company if there was a loss in the mill. They are the only bill we are supposed to guarantee from the corporation. No other bills."