James R. O'Connor v. Commissioner.
O'Connor v. Commissioner
Docket No. 64496.
United States Tax Court
T.C. Memo 1960-70; 1960 Tax Ct. Memo LEXIS 219; 19 T.C.M. (CCH) 380; T.C.M. (RIA) 60070; April 11, 1960
*219 Upon the facts, held that the petitioner was not engaged in a joint venture but was a guarantor of losses; that he sustained a loss in the year when his obligation was performed and payment was made; and that he is entitled to deduct his loss under section 23(e)(2) in the year of payment. Donal C. Noonan, Esq., 18 East 48th Street, New York, N. Y., for the petitioner. Victor H. Frank, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined *220 a deficiency in income tax for the year 1953 in the amount of $2,671.13. The question is whether the petitioner sustained a loss in 1953 under section 23(e)(2) in the amount of $3,965.95 when he made payments in that year to 2 persons to compensate them for losses from sales of stocks in earlier years which they had purchased with their own funds; or whether the petitioner was a joint venturer with them and, therefore, sustained capital losses in 1949 and 1950 when the stocks were sold. Findings of Fact The petitioner, a resident of New York City, filed his return for 1953, on a cash basis, with the district director of internal revenue for the Upper Manhattan district. The petitioner is an accountant and is now an inactive member of an accounting firm in New York City, Sack, O'Connor & Sack, in which he was an active member for several years including the period 1944-1949. In 1950, petitioner became associated with Unexcelled Chemical Corporation of New York City as vice president. He became the president of the corporation in 1953 and held that office until November 1958 when his association with the corporation ended because of a proxy fight. Unexcelled Chemical Corporation *221 owns several business enterprises. Its stock is listed on the American Exchange. The petitioner has at all times material, before and since 1944, followed the securities market fairly closely and invested in securities. He has general knowledge about the market. Sometimes he received what he designated as confidential information about the affairs of various enterprises. In the early forties, petitioner was well acquainted with Jerome Levy and his wife, Ruth. The O'Connor & Sack accounting firm had done accounting work for Jerome's father and, later, for Jerome. Petitioner had known Jerome for 40 years. Jerome's father was the principal owner of the Standard Tallow Company, a business in Newark, New Jersey. Jerome inherited the business upon the death of his father. Jerome was active in a number of enterprises and was a man of means. He also was interested in the stock market. In 1945, the petitioner and Jerome and Ruth Levy entered into an informal, oral agreement. It was agreed that Jerome would consult petitioner to obtain his recommendations and advice about buying securities from time to time; that Jerome, acting for either himself or his wife, would make the final decision *222 about whether to purchase or not to purchase a security recommended by the petitioner; that the Levys would use their own funds entirely for all purchases; that the securities would be purchased in the name of either Jerome or Ruth, or occasionally in a street name; that all contracts with brokers would be exclusively by Jerome; that all receipts from the sales of securities and from dividends would be received by Jerome or Ruth; that the possession of securities purchased would be exclusively by the Levys; and that, with respect to the sales of securities purchased upon the recommendation of the petitioner, the Levys would consult the petitioner about the advisability of making sales and the time when such sales should be made; and that within 1 year after the Levys bought a security recommended by petitioner, petitioner could object to a sale without his consent, but after 1 year the Levys were free to sell a security without requesting petitioner's advice. It was agreed, further, that Jerome and Ruth would make payments to the petitioner of one-half of all net gains and one-half of all cash and stock dividends; and that the petitioner guaranteed to reimburse Jerome and Ruth for *223 the entire amount of any losses which they sustained if they purchased a stock which petitioner recommended. There was a general decline in stock prices in 1947. The Levys did not make any purchases of stock after 1947 under the agreement. The period of the agreement extended through 1945-1947, inclusive. Ruth was not familiar with security transactions. Jerome handled all of the security transactions for her. Petitioner gave her a written guaranty against loss. Petitioner did not have authority to communicate with the brokers who transacted the purchases and sales for the Levys, and he did not ever do so; he never placed an order to buy or sell a security. He did not contribute any funds toward purchases made by the Levys. He did not at any time have any access to, possession of, or control over securities purchased by Jerome for himself and his wife. Beginning in 1945 through 1947, Jerome sought petitioner's advice, from time to time, about purchasing corporate stocks, and Jerome made some recommended purchases. Jerome did not always follow petitioner's recommendations about buying a stock. In 1946, Jerome purchased for himself, in his name, and his wife, in her name, shares *224 of stock in two corporations, Pathe Industries and Standard Cap and Seal, which were recommended by petitioner. Jerome and Ruth held these stocks for a few years. In 1949, Ruth sold 100 shares of Pathe Industries stock at a loss of $1,273.24. Neither Jerome nor Ruth consulted petitioner about making the sale. They were not obliged to do so. The Levys made the decision to sell the stock; petitioner did not instruct or advise them to do so. Shortly after the sale, Ruth made demand upon petitioner to pay her the amount of the loss. She repeatedly made that request. Petitioner was unable to make the payment in 1949, or thereafter, until January 6, 1953, when he paid Ruth $1,273.24. In 1950, Jerome sold 118 shares of Standard Cap and Seal at a loss of $2,692.71. He did not consult petitioner about making the sale. He was not obliged to do so. Petitioner did not instruct him to make the sale. Soon afterward, in 1950 Jerome made a demand upon petitioner to pay him the amount of his loss. Petitioner was unable to make the payment in 1950, or thereafter, until January 6, 1953, when he paid Jerome $2,692.71. Petitioner paid the Levys the total sum of $3,965.95 on January 6, 1953. The *225 Levys received some profits from some of the securities they purchased and, under the agreement, they paid one-half to petitioner on about six occasions by their own checks. Dividend checks were never received by petitioner. A record was kept in accounting records of the Levys of the purchases and sales made by the Levys under the agreement. Petitioner did not keep such record and he did not have access to their account books. Jerome died at some time after January 1953 and before the trial of this case. The petitioner deducted $3,965.95 as an ordinary loss in his 1953 return, the full amount of his total payments to the Levys on January 6, 1953. He took the deduction in itemized deductions as a loss from indemnification under guaranty. The respondent disallowed the entire deduction and gave the following reason for his determination: "It is held that the deduction of $3,965.95 claimed on your return as 'Loss from Indemnification Under Guaranty' is a loss subject to the limitations provided in section 117 of the Internal Revenue Code with respect to gains and losses on the sale and exchange of capital assets. Whereas the loss was sustained in the years *226 1949 and 1950 the deduction of $3,965.95 is accordingly disallowed." The petitioner did not contribute at any time any money to purchases of securities bought by the Levys; he did not have or exercise any control over securities purchased by them, and he had no possession of such securities; he did not have or exercise control over either their purchases or sales of securities; and he did not have any right to prevent the Levys from either buying or selling a stock. Petitioner and the Levys did not intend in 1945, when the oral agreement was made, to enter into or engage in a joint venture. The 1945 oral agreement between petitioner and Jerome and Ruth Levy did not create a joint venture between them. Opinion The petitioner claims an ordinary loss deduction in 1953 under the provisions of section 23(e)(2) of the 1939 Code [1] in the amount of $3,965.95, claiming that the payments involved were made to the Levys under a guaranty. He denies the existence of a joint venture with the Levys and having any interest in the corporate stocks in question, which were sold by the Levys in 1949 and 1950, which could give rise to his sustaining capital losses in the year of each sale. *227 It is the respondent's position that there was a joint venture in which petitioner was a member; that his distributable share of the loss upon each sale was a capital loss sustained in each year of sale; and that under section 182(b) [2] he was required to include as part of his gains and losses from sales of capital assets, his distributive share of the losses of the partnership. Whether or not a joint venture exists depends upon the intent of the parties at the time they enter into an agreement. The real intent of the parties is to be ascertained from the terms of the agreement, all of the relevant facts and circumstances, and their conduct in carrying out the provisions of the agreement. Cf. Wm. J. Lemp Brewing Co., 18 T.C. 586, 597. The question here is whether there *228 was a joint venture between the petitioner and Jerome and Ruth Levy. The issue to be decided involves essentially a question of fact. The petitioner relies largely upon his own testimony. The respondent's view indicates a considerable amount of skepticism and suspicion, and he argues that petitioner's testimony is not entitled to receive very much weight. The entire record has been carefully considered. The petitioner testified that under the arrangement agreed to in 1945, he at no time purchased a security or placed an order for any, did not contribute funds for the purchase of securities; did not have any right to buy or sell any security for the account of either Jerome or Ruth, and had no control over purchases or sales of securities made by Jerome for himself or his wife; that the agreement was carried out according to its terms, and that on a few occasions when the Levys realized gain and received cash and stock dividends they paid him one-half thereof; that Jerome, acting for himself and his wife, made the final decision whether to purchase a security and that Jerome had the right to sell any security in his sole judgment and discretion without consulting the petitioner. *229 There was an understanding that the Levys would give the petitioner an opportunity to object to the sale of any security within 1 year after the purchase, but not thereafter. This was, the petitioner testified, because of his guarantee to make reimbursement of the full amount of any loss to the Levys upon the sale of a security and should the price of a stock go down, a waiting period of 1 year might secure to the petitioner time within which the price might go up. In our opinion this understanding was a matter of prudence in view of petitioner's obligation to make good losses; it did not constitute control by petitioner over the Levys' right to decide when to sell; and, in itself, it did not constitute the arrangement a joint venture. It has been held that an "arrangement whereby two or more persons share the profits of a common undertaking does not constitute a joint venture in the absence of power of joint control." Joe Balestrieri & Co. v. Commissioner, 177 F. 2d 867. We are persuaded here, upon the record, that petitioner's position in the arrangements with the Levys was that of a guarantor and not of a joint venturer. Cf. E. L. Connelly, 46 B.T.A. 222; *230 Samuel Eugene Bramer, 6 T.C. 1027, affd. 161 F. 2d 185, certiorari denied 332 U.S. 771; Paddock v. United States, - F. Supp. -. The Commissioner erred in disallowing the deduction. Decision will be entered for the petitioner. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *.↩
2. SEC. 182. TAX OF PARTNERS. In computing the net income of each partner, he shall include, whether or not distribution is made to him - * * *
(b) As part of his gains and losses from sales or exchanges of capital assets held for more than 6 months, his distributive share of the gains and losses of the partnership from sales or exchanges of capital assets held for more than 6 months.↩