Jules R. Green and Rose Green, et al. [1] v. Commissioner. Green v. Commissioner
Docket Nos. 89394, 89395, 93575.
United States Tax Court
T.C. Memo 1965-272; 1965 Tax Ct. Memo LEXIS 57; 24 T.C.M. (CCH) 1480; T.C.M. (RIA) 65272; October 12, 1965
Harold R. Burnstein, 105 W. Adams St., Chicago, Ill., for the petitioners in Docket Nos. 89394 and 89395. Joseph M. Solon, for the petitioners in Docket No. 93575. Charles B. Wolfe, Jr., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, *58 Judge: Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Petitioner
Docket No.
Year
Deficiency
Jules R. and Rose Green
89394
1954
$ 11,387.21
1955
8,948.33
1956
82,554.70
Harold J. and Marion F. Green
89395
1954
163,510.36
1955
296,335.68
1956
310,242.84
Estate of Frederick A. Smith, Deceased, and
Lenore F. Smith
93575
1956
40,786.92
The above dockets were consolidated for trial and decision. The issues presented for our decision are: (1) Whether or not the amount of $64,992.74 received by petitioners Jules R. Green and Harold J. Green in equal amounts of $32,496.37 during 1956 constitutes ordinary income or long-term capital gain; and (2) whether the total amount of $64,992.74 paid by Frederick A. Smith to Harold and Jules Green during 1956 constitutes interest deductible for that year under section 163(a) of the Internal Revenue Code of 1954. Additional issues presented by the pleadings have been disposed of by agreement or concession of the parties. Findings of Fact Some of the facts have been stipulated and are found accordingly. *59 For each of the years 1954, 1955, and 1956, petitioners Jules R. Green and Rose Green, husband and wife, filed joint income tax returns with the director of internal revenue at Chicago, Illinois. At all times pertinent hereto, petitioners resided in Chicago, Illinois. For each of the years 1954, 1955, and 1956, petitioners Harold J. Green and Marion F. Green, husband and wife, filed joint income tax returns with the director of internal revenue at Chicago, Illinois. At all times pertinent hereto, petitioners resided in Chicago, Illinois. During 1956, Frederick A. Smith and Lenore F. Smith, husband and wife, filed their joint income tax return with the director of internal revenue at Chicago, Illinois. They were residents of Chicago, Illinois, at all times here material. 20 Cedar Street, Inc. (sometimes hereinafter referred to as the corporation), was a corporation organized under the laws of the State of Illinois. The principal asset of 20 Cedar Street, Inc., was land and improvements thereon located at 20 East Cedar Street, Chicago, Illinois. Included in the improvements was a 19-story concrete, brick, and stone apartment building containing 48 apartments with 326 rooms. *60 In 1956 the outstanding capital stock of 20 Cedar Street, Inc., consisted of 14,519 shares of $1 par value common stock. The estate of Joseph Seranella owned 10,003 shares, or approximately 68 percent, of the outstanding stock of the corporation on or about April 25, 1956. Frederick A. Smith and his nominees owned 2,093 shares, or approximately 14 percent, of the outstanding stock of the corporation on or about April 25, 1956. The American National Bank and Trust Company of Chicago was the transfer agent of the corporate stock of 20 Cedar Street, Inc.
Joseph Seranella, formerly of Chicago, Illinois, died testate on May 21, 1952. Smith was at all times relevant the duly appointed, qualified, and acting executor of the estate of Joseph Seranella. The Last Will and Testament of Joseph Seranella provided in pertinent part as follows: (a) That the decedent's debts and funeral expenses should be paid; (b) That a specific legacy should be paid to Harriet O. Seranella; and (c) That a trust should be established, the corpus of which would consist of all the rest, residue and remainder of the estate, and the trustees of which would be Smith and Harriet. The beneficiaries of the *61 trust established under the will of Joseph Seranella were: Harriet O. Seranella, Fred Seranella, John Seranella, Sam Seranella, Anthony Seranella, and Mary Dassisi. Smith possessed a 2/12 interest in the estate of Joseph Seranella. Beginning in June 1955, Smith embarked on a program which had as its objective the acquisition of as many shares of stock as possible of 20 Cedar Street, Inc. He desired to acquire the stock of the corporation so that the corporation could be liquidated and title to its land and apartment building conveyed to him and his wife. Smith intended, upon liquidation of the corporation and acquisition of its principal asset, to obtain a mortgage loan on the property in an amount sufficient to enable him to finance the purchase of the stock held by the Seranella heirs and the minority shareholders. During 1955 and 1956, he continued to purchase shares of stock of the corporation from minority stockholders. On December 21, 1955, Harriet and Smith entered into an agreement, the essential terms of which are as follows: Harriet agreed to sell to Smith all her right, title, and interest in the estate of Joseph Seranella, whether as a beneficiary under the trust *62 or an heir-at-law, except the following: (1) Her rights as a creditor of the estate, she having previously filed a claim against the estate in the sum of $52,958.95; (2) Her surviving spouse's award; and (3) Amounts which had been previously paid to her. Smith agreed to pay Harriet as consideration for the sale the sum of $118,750, less such amount as would be required to pay Illinois inheritance taxes on the specific legacy and her beneficial interest in the trust. Smith deposited $7,500 with Harriet on December 21, 1955, to be applied against the purchase price, and he agreed to pay the balance of the purchase price on or before April 18, 1956. In the event Smith defaulted in the performance of the terms of the agreement, the down payment of $7,500 was to be forfeited to Harriet and he was to be limited to a receipt of $25,000 as executor's fees. In the event Harriet defaulted in the performance of the terms of the agreement, or in the event of her death prior to the consummation of the agreement, Smith was given the right to terminate the agreement and recoup the down payment of $7,500. It was agreed that the agreement should be binding upon and inure to the benefit *63 of the heirs, executors, administrators, and assigns of both Harriet and Smith. Simultaneously with the execution of the agreement of December 21, 1955, Harriet executed various documents, including an assignment of her right and title to the estate of Joseph Seranella and the trust established therein, which were required of her by the agreement. Smith also executed an agreement with the five brothers and sisters of Harriet on December 21, 1955, to purchase their interests in the Joseph Seranella estate in consideration of a deposit of earnest money plus his promise to pay a balance of $103,450. Pursuant to an escrow agreement dated December 21, 1955, the agreement dated December 21, 1955, and the collateral documents executed by Harriet in pursuance of the agreement were placed in escrow with Max A. Kopstein pending Smith's performance. Pursuant to an application for a mortgage loan previously made by Smith, The Great-West Life Assurance Co. on March 5, 1956, issued a commitment letter, the essential terms of which are as follows: (1) The amount of the loan was to be $750,000. (2) The security for the loan was stated to be: A first mortgage on the land and improvements *64 thereon known as 20 East Cedar Street, Chicago, Illinois. Included in the said improvements is a 19-storey concrete brick and stone apartment building containing 48 apartments with 326 rooms. (3) Upon acceptance of the commitment, the applicant was required to deposit $3,750 with the Great-West Life Assurance Co. (4) The deposit of $3,750 was to be refunded to the applicant upon disbursement of the loan proceeds. If the applicant failed to proceed with the loan, the deposit of $3,750 was to be retained by the company as liquidated damages. (5) The terms of the commitment were to be accepted by the applicant by March 20, 1956. (6) If the terms of the commitment were accepted, the commitment was to remain in force until August 31, 1956, unless the time for acceptance was extended by the company. On March 9, 1956, Smith paid to The Great-West Life Assurance Co. the deposit of $3,750 and accepted the terms of the commitment of March 5, 1956, subject to the following revisions: (a) The commitment was to remain in force until November 15, 1956. (b) Title to the mortgaged property was to be in a corporation to be formed or in a corporate trustee. On March 19, 1956, Smith was *65 notified that his revisions to the commitment letter of March 5, 1956, were accepted. Smith sought to borrow the funds necessary to finance the purchase price of the stock owned by the Seranella heirs. His efforts to secure interim financing were unsuccessful and by April 18, 1956, he faced the possibility of default under the agreement of December 21, 1955. On or about April 27, 1956, Smith paid Harriet $5,000 in consideration for an extension of time to 4 p.m. on May 4, 1956, during which time Smith could make payment of his obligation under the agreement of December 21, 1955. The $5,000 amount paid on or about April 27, 1956, was not applicable to the purchase price of the stock of the Seranella heirs but was paid solely for the extension of time. Prior to May 3, 1956, Smith had contacted numerous persons for the purpose of securing funds in the amount of $325,000 with which to purchase the stock owned by the Seranellas. On or about May 3, 1956, Smith approached Harold Green for the purpose of securing funds in the amount of $325,000. Smith and Harold had been acquainted for approximately 25 years. Smith offered to pay Harold $65,000 for the use of $325,000 for a period *66 of 6 months to 1 year. Harold agreed to arrange interim financing for Smith in the above-stated amount and Smith obligated himself to repay the $325,000 within 12 months from May 3, 1956 (but in not less than 6 months from that date), together with an additional $65,000. Harold and Jules furnished Smith the amount of $325,000, as follows: On May 3, 1956, Harold and Jules negotiated a loan from the American National Bank and Trust Company of Chicago, in the amount of $325,000. On May 4, 1956, certificate No. 1220, representing 12,096 shares of common stock of 20 Cedar Street, Inc., was surrendered by Anthony J. Kogut and certificate No. 1222, for 12,096 shares, was issued in the name of Harold J. Green and Jules R. Green and was delivered to them as collateral for the funds advanced by them to Smith. The Greens gave the American National Bank and Trust Company a note dated May 3, 1956, bearing a due date of August 1, 1956. The understanding at the time the loan was negotiated was that the loan would be renewable until the transaction of the Greens with Smith was completed. The note was extended on August 1, 1956, to November 29, 1956. The American National Bank and Trust Company *67 of Chicago received from Harold and Jules the following items as collateral for the said loan: (1) A $62,000 note dated March 1, 1956, executed by 20 Cedar Street, Inc., payable to the order of Frederick A. Smith, Executor (endorsed to Anthony J. Kogut). The note was due on demand bearing 4 percent interest. (2) A photostatic copy of the mortgage loan commitment from The Great-West Life Assurance Co. covering the land and apartment building located at 20 East Cedar Street, Chicago, Illinois. (3) Certificate No. 1222, representing 12,096 shares of common stock of 20 Cedar Street, Inc., issued in the name of Harold J. Green and Jules R. Green. This certificate was delivered to the bank on May 8, 1956. The Greens received the loan proceeds in the form of a cashier's check made payable to the order of Harold J. Green and Jules R. Green in the amount of $325,000 and bearing date of May 3, 1956. The cashier's check was endorsed by the Greens as follows: "Pay to the order of Anthony J. Kogut." Anthony J. Kogut endorsed the cashier's check in blank and purchased therewith cashier's checks as follows: (1) Check dated May 3, 1956, for $111,250 payable to the order of Max Kopstein, *68 attorney for Harriet Seranella. (2) Check dated May 3, 1956, for $48,750 payable to the order of Harriet Seranella. (3) Check dated May 3, 1956, for $103,450 payable to the order of Sam Morgan. (4) Check dated May 3, 1956, for $61,550 payable to the order of Fred A. Smith. The above-described transactions which occurred on May 3, 1956, discharged Smith's obligations to purchase the interests of the Seranella heirs in the stock of 20 Cedar Street, Inc.
Shortly after the transactions completed on May 3 and 4, 1956, Harold delivered to Smith the following document dated May 3, 1956, which was prepared by Harold in his own handwriting: I hold 12096 shares of stock of 20 Cedar Street, Inc. an Illinois corporation which I will deliver to you within 12 months from this date upon your payment to me in cash the sum of three hundred ninety thousand dollars ($390,000.00) On June 20, 1956, Harold wrote to Smith as follows: It has been said that neither time nor tide waits for man. Practically six (6) weeks have gone by since we entered into our transaction and while I know that because of income tax reasons you do not want to consummate your phase of it before six (6) months, *69 I still want to call your attention to the fact that six (6) weeks have already elapsed. During the summer traditionally little business is transacted. Now mind you, I am not registering any complaint - I am merely issuing a reminder. Have you formulated any plans on how to acquire the minority stock? How have you progressed in such acquisition? I should appreciate a letter from you answering these questions. On August 9, 1956, Harold wrote the following letter to Smith: This will supplement my letter to you of June 20, 1956. As you know, my loan at the American National Bank was originally made for ninety days, with the understanding, of course, that I could renew it until this particular transaction was completed. The ninety days were up just eight days ago and I paid the Bank about $4,800.00 to apply on interest. I was given a rough time on the renewal and had to raise the interest rate to approximately six percent. Their reason is that money is getting much tighter and, therefore, much more expensive. My reason for going into such detail with you is not to tell you that since my cost was increased that your cost should be increased - on the contrary, your cost is fixed *70 no matter what my cost is because, a bargain is a bargain. However, if the Bank is correct in its statement that money is getting tighter and, in accordance with its prophecy, they expect it to become even tighter still, it appears to me that sound business judgment would compel you to consummate your refinancing transaction in accordance with the terms of your loan commitment rather than speculate upon getting a renewal thereof. You told me you were flirting with Salk, Ward & Salk in the hopes of getting a larger loan than your commitment calls for. For my files, I should like a letter from you giving me the status of your refinancing program; i.e. are you going to have a sale of the property and if so when; also advising me of your projected closing date and where, of course, would you obtain your refinancing. On September 5, 1956, Harold again wrote to Smith: This is to acknowledge the receipt of your notice of annual meeting of shareholders to be held on Friday, September 14, 1956, called only for the purpose of electing directors. Do you honestly expect to consummate your deal in November of 1956? I need this information in order to plan the placing of the loan on the *71 stock if the transaction will not be closed by that time. You know that the American National Bank has told me that it will not renew the loan and, therefore, I must make new banking connections - this I do not like to do unless necessary and, of course, if necessary, I want to plan now so that neither of us will be embarrassed in November. As I have told you on the telephone several times, interest rates are getting higher and higher - Manury Bellows was raised on a loan commitment from 5% to 5 1/4%. I am trying to keep you fully informed of my problems (which could easily be your problems) and economic conditions as well. Please evaluate your situation and drop me a line as you have repeatedly promised * * * On September 7, 1956, Smith replied to Harold: The following is the schedule of dates for meetings, sale, etc. with regard to 20 Cedar Street. This is for your own private information for the present. September 14 annual meeting of shareholders for the election of directors. September 17, Special meeting of Directors for the purpose of adopting plan of liquidation. September 29, Special meeting of shareholders to act upon the proposed plan of liquidation. October *72 26, Public sale of the property. Assuming no unforseen complications arise (and I don't anticipate any) the proceeds of the new mortgage will be available for distribution on or before November 15th. Answering your query, I certainly expect to be able to consummate the entire deal in November. I realize the tight conditions that prevail in the money market and I will do everything possible to close in time to conform with the mortgage commitment date. I intend to keep you fully advised of all developments as they come to my attention. I appreciate your concern Harold but believe me, I also am concerned more than a little. Incidentally, I will need a proxy from you and Jules to vote the shares standing in your names at the annual meeting and I will appreciate it if you will mail the same to me at your convenience. * * *
By letter dated September 10, 1956, Harold and Jules transmitted their proxy for use in connection with a meeting of the shareholders of the corporation held on September 14, 1956. On September 17, 1956, Harold wrote to Smith requesting a copy of the minutes of the meeting of the directors of 20 Cedar Street, Inc., adopting a plan of liquidation. Prior *73 to November 1956, the corporation was liquidated and title to the land and apartment building located at 20 East Cedar Street was conveyed to the Exchange National Bank of Chicago as a corporate trustee holding title for Smith and his wife, Lenore F. Smith. On November 30, 1956, the proceeds of a mortgage loan from The Great-West Life Assurance Co. were disbursed as follows: Receipts: Principal amount of loan
$750,000.00
Commitment fee
3,750.00
Disbursements: Commission
$ 3,750.00
Interest
3,125.00
Title expense
286.50
Appraisal fee
500.00
Reserve for taxes
14,360.21
To retire existing mortgage
319,662.31
Frederick A. Smith and Lenore Smith
422,065.98
$753,750.00
$753,750.00
The following occurred with respect to the check for $422,065.98 received by Smith and his wife from the distribution of the proceeds of the mortgage loan: The check was delivered to Harold and Jules Green on November 30, 1956. On November 30, 1956, the check was deposited by Harold and Jules in their account at the American National Bank and Trust Company of Chicago. Harold and Jules Green, on November 30, 1956, instructed the American National Bank and Trust *74 Company to do the following when the check for $422,065.98 had cleared with the First National Bank: (1) Deliver a check in the amount of $32,065.98 to Smith, charging the account of Harold and Jules Green. (2) Deliver to Smith 12,096 shares of the common stock of 20 Cedar Street, Inc.
(3) Deliver to Smith the demand note in the amount of $62,000, dated March 1, 1956, signed by 20 Cedar Street, Inc., payable to the order of Frederick A. Smith, Executor. (4 Cancel the note of the Greens payable to the order of the American National Bank and Trust Company in the amount of $325,000 and return said note to the Greens. Smith exercised complete control and management over the apartment building both before and after May 4, 1956. Neither Harold nor Jules Green exercised control over the management of the property. On his income tax return for 1956 Smith claimed a deduction for interest paid to Harold Green during that year in the amount of $65,000. In his notice of deficiency, the respondent disallowed the interest deduction so claimed. On their income tax return for 1956, Harold and Marion Green reported $32,496.37 as long-term capital gain realized in that year from a sale *75 of one-half the stock of 20 Cedar Street, Inc.
In his notice of deficiency, the respondent determined that the amount so reported by Harold and Marion Green constituted ordinary income. On their income tax return for 1956, Jules and Rose Green reported $32,496.37 as longterm capital gain realized in that year from a sale of one-half the stock of 20 Cedar Street, Inc.
In his notice of deficiency, the respondent determined that the amount so reported by Jules and Rose Green constituted ordinary income. Ultimate Finding Smith did not transfer the beneficial ownership of his stock of 20 Cedar Street, Inc., to Harold and Jules Green during 1956. Smith and the Greens did not enter into a joint venture to obtain the property located at 20 East Cedar Street. The transaction between Smith and the Greens which occurred on May 3, 1956, was a loan, and the $65,000 amount paid by Smith to the Greens on or about November 30, 1956, constituted interest. Opinion The estate of Frederick A. Smith, deceased, and Lenore F. Smith contend that the transaction pursuant to which $325,000 was advanced to Smith by Harold and Jules Green on May 3, 1956, was a loan and that the $65,000 amount *76 paid to the Greens on November 30, 1956, constituted interest. Petitioners Harold and Jules Green insist that the arrangement in question constituted a purchase by them of Smith's interest in the stock of 20 Cedar Street, Inc., on May 3, 1956, for $325,000 followed by a resale of the stock to Smith for $390,000 on November 30, 1956. They contend that the $65,000 difference between the amount paid to Smith and the amount subsequently received from him constitutes long-term capital gain. The respondent has taken the position that the transaction between Smith and the Greens was neither a loan nor a sale and resale of stock but was a joint venture arrangement whereby Harold and Jules Green, together with Smith, acquired a building and divided the proceeds of the mortgage loan from The Great-West Life Assurance Co. on approximately a two-to-one basis. He accordingly contends: (1) That the $65,000 amount realized by the Greens constitutes a distributive share of partnership income which is taxable to them at ordinary income rates, and (2) that such amount is not deductible by the estate of Frederick A. Smith. With respect to the respondent's contention that the relationship existing *77 between the Greens and Smith from May 3, 1956, to November 30, 1956, amounted to a joint venture arrangement, if such a relationship actually existed between them, they are for tax purposes to be treated as partners under sections 761(a) and 7701(a)(2) of the 1954 Code. A joint venture is often described as a combination of two or more persons where is some specific venture a profit is jointly sought without any actual partnership or corporate designation. See Tate v. Knox, 131 F.Supp. 514; Estate of L. O. Koen, 14 T.C. 1406, 1409. Whether or not a joint venture relationship in fact exists depends essentially on the intention of the parties. Donald P. Oak, 46 B.T.A. 265. It is clear that without an express or implied agreement among the parties to share the profits and losses of an undertaking there can be no joint venture relationship. Lucia Chase Ewing, 20 T.C. 216; Chisholm v. Gilmer, 81 F. 2d 120; Joe Balestrieri & Co. v. Commissioner, 177 F. 2d 867, affirming a Memorandum Opinion of this Court; Aiken Mills v. United States, 144 F. 2d 23; *78 and Tompkins v. Commissioner, 97 F. 2d 396. The record indicates that Smith and the Greens gave no consideration to the possibility of sharing future losses between themselves. Harold Green explained to Smith that in his opinion any loss he (Harold) might realize from the transaction likely would be treated as a capital loss for tax purposes. It appears from Harold's testimony in this regard that he contemplated the total absorption of any losses himself in the event Smith should become unable to "repurchase" the stock of 20 Cedar Street, Inc., after the expiration of a 6-month period. On the other hand, the most Smith could hope to gain if the plan succeeded was to obtain a mortgage loan in the amount of $750,000 from The Great-West Life Assurance Co. which according to the testimony here presented he hoped would net him approximately $30,000 to $40,000 in borrowed funds. Under the arrangement agreed upon it was anticipated that the Greens would be enriched by approximately $65,000 and that Smith's net worth would remain unchanged. There was no understanding or expectation that Smith would realize any actual profit from the undertaking. In the absence of an agreement *79 to share either profits or losses, we are unable to find that the parties intended to create a joint venture relationship. Turning next to the contention of petitioners Harold and Jules Green that the transaction in question amounted to a purchase and sale of the corporation's stock, Harold stated at the trial that he would not have consented to the arrangement if it had not been handled as a sale of stock to him and his brother Jules with an option granted to Smith to repurchase it. On direct examination, Harold testified that in response to Smith's initial inquiry on or about May 1, 1956, he (Harold) stated to Smith as follows: this is the basis that I will handle it on: My brother and I will buy the stock for $325,000. You have my word that we will sell it back to you after six months for $390,000. And he [Smith] said: Fine; I will arrange to have the stock sold to you. * * * However, the record indicates that neither Harold nor Jules actually desired to acquire ownership of the stock of 20 Cedar Street, Inc., or to invest their funds therein at the risk of the business. The apparent purpose of the Greens in entering into the arrangement in question was the opportunity to *80 realize a profit in an approximate amount of $65,000 in return for utilization of their credit in procuring an immediate bank loan of $325,000 for the benefit of Smith. The principal reason for casting the transaction in the form of a sale and repurchase of stock was to achieve the most favorable tax treatment for the Greens. Harold testified as follows: in the income tax bracket which my brother, Jules, and I, find ourselves we cannot retain after taxes much of this $65,000, and that if perchance this loan which you would like to make turned out to be improvident so that there was a loss, there is no doubt in my mind, from the cases that I have read, that the Government would take the position that my brother and I are primarily lawyers, were not engaged in the business of lending money, and, therefore, any loss that we took would be a capital loss, and I said to Fred: The only way that my brother and I would be interested in this type of transaction would be if we could make a capital gain. I said: If I am going to have a capital loss I am going to have a capital gain. An additional factor which also may have influenced the Greens' insistence upon handling the formalities of *81 the transaction as a sale rather than as a loan was the fact that if treated as interest, the $65,000 anticipated profit exceeded the limits provided by the Illinois usury statute. [2] If characterized as interest, the $65,000 profit charged by the Greens for the use of $325,000 would amount to a return of roughly 37 percent for the period of approximately 7 months during which the funds were in the hands of Smith. The record discloses that the matter of usury was discussed by Smith and the Greens at their initial conference and it is apparent that the Greens would wish to deprive Smith of any possible defense based upon a usurious interest charge. When Smith first contacted Harold on or about May 1, 1956, he was in urgent need of financial assistance. He faced forfeiture of his option to acquire a controlling interest in the stock of 20 Cedar Street, Inc., from the Seranella heirs in the event he could not raise $325,000 by May 4, 1956. He had contacted other persons in an effort to borrow the needed funds but was unsuccessful. He had obtained an extension *82 of the option period for which he had paid the Seranella heirs $5,000. With time running out on the extended option and out of a sense of desperation, he contacted Harold, offering to pay $65,000 for an immediate loan of $325,000. It is quite obvious that Smith regarded the transaction here involved as a cash loan to him. In approaching Harold, Smith did not offer to sell the stock of 20 Cedar Street, Inc. In fact his paramount purpose was to retain ownership of the stock so as to be in a position to liquidate the corporation and to obtain the proceeds of a mortgage loan under conditions imposed in the written commitment of The Great-West Life Assurance Co. The terms of the mortgage commitment required the liquidation of the corporation and the acquisition of the apartment building by either a new corporation or a corporate trustee. If Smith had relinquished the beneficial ownership of the corporation's stock, he would have defeated the purpose of the transaction consummated with Harold and Jules. The record contains other evidence which tends to support the characterization of the transaction here involved as a loan. First, Anthony Kogut, who served as Smith's nominee in connection *83 with the transaction in question and who was present at the first meeting with Smith and the Greens on or about May 1, 1956, testified that the arrangement between the parties was that of a loan to Smith of $325,000 with an obligation on his part to repay the Greens $390,000 more than 6 months later. Kogut explained that the 12,096 shares of stock of 20 Cedar Street, Inc., were transferred to the Greens as security for the loan. Next, under the terms of the agreement between the parties Harold and Jules were required to reconvey the stock of 20 Cedar Street, Inc., to Smith after the expiration of a period of 6 months in the event Smith should demand it and pay $390,000. The very fact that the Greens in such event were obligated to relinquish the stock tends to negate their contention that in substance a sale of stock to them occurred on May 3, 1956. It is inconsistent with the nature of a sale for the purchaser to acquire property which, upon the demand of the seller, he (the buyer) may be required to return. Such an arrangement partakes of the nature of a pledge of stock as security rather than an outright sale. The delivery to the Greens of the stock certificates evidencing 12,096 *84 shares of 20 Cedar Street, Inc., a promissory note in the amount of $62,000, and a written mortgage loan commitment for $750,000 executed by The Great-West Life Assurance Co. indicates that they regarded the documents as collateral for the funds advanced to Smith. Further, a document was prepared by Harold in his own handwriting, dated May 3, 1956, and delivered to Smith stating: I hold 12096 shares of stock of 20 Cedar Street, Inc. an Illinois corporation which I will deliver to you within 12 months from this date upon your payment to me in cash the sum of three hundred ninety thousand dollars ($390,000.00) The preparation and delivery of this document by Harold also seems to indicate an acknowledgment by him that he regarded himself as a pledgee of the stock of the corporation. The correspondence exchanged between Harold and Smith during the summer of 1956 reflects Harold's concern as a creditor rather than the confidence of a person in the position of an owner of stock or a co-adventurer in an informal partnership arrangement. In his letter of June 20, 1956, Harold stated to Smith: while I know that because of income tax reasons you do not want to consummate your phase *85 of it before six (6) months, I still want to call you attention to the fact that six (6) weeks have already elapsed. * * * Now mind you, I am not registering any complaint - I am merely issuing a reminder. Have you formulated any plans on how to acquire the minority stock? How have you progressed in such acquisition? I should appreciate a letter from you answering these questions. In Harold's letter to Smith dated August 9, 1956, Harold referred to Smith's "refinancing transaction" and also described Smith's "cost" as being "fixed." In his letter to Smith dated September 5, 1956, Harold stated: "I want to plan now so that neither of us will be embarrassed in November." Harold's letter further stated: "I am trying to keep you fully informed of my problems (which could easily be your problems)." Taken together, the above-mentioned letters addressed to Smith seem to suggest an implicit obligation on the part of Smith to consummate his plan for liquidating the corporation, obtaining the proceeds of a mortgage loan from The Great-West Life Assurance Co., and repaying the Greens the agreed amount of $390,000. A further factor which tends to indicate that a sales transaction was *86 not in fact consummated is the obvious failure on the part of the Greens to exercise actual control over the affairs of 20 Cedar Street, Inc.The acquisition of control over corporate affairs is perhaps the most significant attribute of the ownership of common stock. It is clear from the record that Smith exercised the full power of management of the corporation during the approximately 7 months during which the stock certificates of the corporation were in the possession of the American National Bank and Trust Company of Chicago. The only evidence which indicates some slight interest on the part of Harold in the management of the apartment located at 20 East Cedar Street (which was the sole asset of the corporation) is a letter addressed to Smith in which Harold requested him to make every effort to accommodate a personal friend of Harold's who wanted to rent an apartment in the 20 East Cedar Street premises. The record discloses that the rental was arranged by the failure to renew an expired lease of one of the previous tenants with respect to whom it appears that Harold had demonstrated *87 a particular dislike. Apart from this single incident, it appears that the Greens had no desire to and did not consider themselves as having the right to exercise control over the affairs of the corporation. It is particularly noteworthy in this connection to observe that although the stock certificates of 20 Cedar Street, Inc., were in possession of the American National Bank and Trust Company of Chicago, Smith caused the corporation to be liquidated during the fall of 1956 and he and his wife personally acquired title to the apartment building which was the principal corporate asset. In pursuance of Smith's original plan, The Great-West Life Assurance Co. consummated the agreed $750,000 loan in return for his mortgage on the premises located at 20 East Cedar Street which were received in liquidation by Smith. If the Greens actually were the beneficial owners of the stock of the corporation, it does not seem that they would permit Smith, if he were a mere option holder, to liquidate the corporation, acquire title to its principal asset, which would place the corporation's property further beyond the grasp of the Greens and immediately place a $750,000 first mortgage against the *88 property. The fact that Smith caused the corporation to be liquidated, its principal asset being distributed to him, and caused a first mortgage to be placed thereon at a time when the corporation's stock certificates were registered in the name of the Greens and held by the bank which originally had advanced them the $325,000 amount strongly indicates that they did not regard themselves as the actual owners of the corporate stock and assets but rather held merely a security interest in the shares of the corporation. Interest has been described as "compensation for the use or forbearance of money." Deputy v. du Pont, 308 U.S. 488. An amount paid a lender as a bonus or premium for the use of money has been held to constitute interest on borrowed capital under section 433 of the 1939 Code. L-R Heat Treating Co., 28 T.C. 894. The transaction here in question is similar to the situation involved in Arthur R. Jones Syndicate v. Commissioner, 23 F. 2d 833, reversing 5 B.T.A. 853. There, the taxpayer was organized by a junior mortgage holder *89 for the purpose of salvaging a building which was under foreclosure by a prior mortgagee. In order to save the property from immediate foreclosure sale, $600,000 in cash was needed which the taxpayer attempted to raise through the sale of preferred stock. After selling preferred stock certificates in amounts sufficient to raise $350,000, the principal promotor of the syndicate sought to borrow $250,000 from an individual who demanded interest at the rate of 14 percent. Upon being advised by the prospective lender's counsel that an interest rate of 14 percent would be usurious under Illinois law, the taxpayer revised its capital structure and created first preferred stock, second preferred stock, and common stock certificates. In consideration of $250,000, all of the first preferred shares were issued to the individual from whom the $250,000 loan previously had been sought. The taxpayer's articles were amended to provide that the first preferred shares were to be redeemed on July 1, 1922, by payment of the par value thereof, plus a dividend at the rate of 14 percent per annum from the date of the registration of the taxpayer's articles. The taxpayer claimed a deduction in the amount *90 of $29,166.65 representing certain payments made to the holder of the first preferred shares during 1921 for the use of the $250,000. The Commissioner disallowed the deduction on the ground that the amount constituted a dividend payment to a shareholder of the taxpayer. The Court of Appeals there concluded that the transaction in substance was a loan and that the formality of issuing shares of preferred stock to the prospective lender of the $250,000 amount was carried through solely to prevent the taxpayer from asserting a defense of usury under the statutes of Illinois. The court therefore held that the amount in question was properly deducted as interest. It is our view that the $65,000 amount paid by Smith to Harold and Jules Green on November 30, 1956, was likewise paid for the use of money and constitutes interest. We are of the opinion that the record herein demonstrates that the transaction between Smith and the Greens which occurred during May 1956 was in substance a loan of $325,000 to Smith with an agreement on his part to repay that amount plus a $65,000 premium for the use of the funds more than 6 months later. We therefore hold that the $65,000 amount here in question *91 constitutes ordinary income to Harold and Jules Green and is deductible by the estate of Frederick A. Smith, deceased, under section 163(a) of the 1954 Code. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Harold J. Green and Marion F. Green, Docket No. 89395; and Estate of Frederick A. Smith, Deceased, Lenore F. Smith, Administratrix, and Lenore F. Smith, Individually, Docket No. 93575.↩
2. The maximum lawful rate of interest in Illinois in 1956 was 7 percent per year. Smith-Hurd Illinois Ann. St., Ch. 74, § 4.↩