## TOMPKINS v. COMMISSIONER OF INTERNAL REVENUE (two cases).

### Nos. 4313, 4314.

Circuit Court of Appeals, Fourth Circuit.

June 6, 1938.

George D. Brabson, of Washington, D. C. (D. H. Blair and Blair & Korner, all of Washington, D. C., on the brief), for petitioners.

Arthur A. Armstrong, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and WAY, District Judge.

WAY, District Judge.

The above entitled cases are appeals from two decisions of the Board of Tax Appeals. The two cases were consolidated before the Board and heard together there and here. The facts have been stipulated by the parties and are, in substance, as follows:

Charles H. Tompkins and Lida R. Tompkins, his wife, of Washington, D. C., during the calendar year 1932, and both prior and subsequent thereto, were the members of a partnership known as Charles H. Tompkins. Each partner owned a fifty per cent interest in the partnership whose business was buying, selling and holding real estate and securities for investment purposes.

In 1928, said Charles H. Tompkins partnership and a corporation known as McPherson Square Corporation, acquired together at a total cost of $145,000 property in the city of Washington, consisting of land and an office building thereon. There was a first deed of trust in the principal amount of $79,000 on the entire property, given in 1926 by a former owner to two trustees to secure first trust notes in that amount held by the Penn Mutual Life Insurance Company. *Payment* of the indebtedness secured by the deed of trust *was assumed by the Tompkins partnership as a part of the purchase price.*

Neither the Tompkins partnership nor any of its members had any financial interest or stock in McPherson Square Corporation. Under the arrangement the Partnership acquired a three-fifths interest and the Corporation a two-fifths interest in the ownership of the property. This transaction was the only venture on which the said Partnership and the Corporation ever embarked together so far as the record discloses or suggests.

The original cost of the partnership's three-fifths interest, was:

| | |
|---|---:|
| Cost of Property | $145,000 |
| Less first Trust | 79,000 |
| Total Cost of interest above first trust | 66,000 |
| 3/5 interest of Charles H. Tompkins Partnership | 39,600 |

In 1932 McPherson Square Corporation became financially involved and could not pay its share of the taxes and the interest on the notes secured by the deed of trust and the Tompkins partnership was unwilling to pay the Corporation's share of the taxes and interest. The situation then existing made it impractical for the Tompkins partnership to secure a voluntary conveyance to it of the corporation's ⅖ equity in the property, for the reason that McPherson Square Corporation was owned by a brokerage company then in receivership, which had assigned all of the stock in the McPherson Corporation to E. E. Pierce Company as collateral, prior to such receivership. The Pierce Company was, therefore, beneficially entitled to the value, if any, exising in the ⅖ equity in the real estate.

On September 23, 1932, after default in the payment of the interest on the deed of trust notes, the surviving trustee in the deed of trust pursuant to the provisions of the trust and to the demand of the Penn Mutual Life Insurance Company, the creditor secured, foreclosed the deed of trust and sold the property through auctioneers at public auction after proper advertisement of the sale in a Washington newspaper.

Subsequent to 1928 and prior to 1932 the first trust notes totalling $79,000 were curtailed by the Partnership and the Corporation in the amount of $6,000, so that in 1932 the notes had been reduced to $73,000 principal. Three-fifths of the curtailment, $3,600, was paid by the Tompkins partnership, thereby increasing the cost of the interest of the partnership in the property from $39,600 to $43,200.

In view of the fact that the Partnership assumed the payment of the indebtedness secured by the deed of trust and would have been liable to the holder of the notes for any deficiency in case the amount bid at public sale and paid for the property was less than the debt plus the

unpaid taxes and cost of sale, the Tompkins partnership bid upon the property at the public sale and became the successful bidder at $79,000. The deed to the property bore date September 23, 1932, the day the trustee's sale occurred, and was made by the surviving trustee named in the deed of trust, to Mr. and Mrs. Tompkins, the members of said partnership.

The advertisement of the sale under the deed of trust stated that the trustee would place a new loan of $73,000 upon the property to a responsible borrower. The purchase price was paid by the Tompkins, by $6,000 cash and the giving of a new deed of trust from the Tompkins upon the entire property for $73,000. The excess of $6,000 of the highest bid over the principal debt of $73,000 was expended in satisfying unpaid taxes, interest and the costs of the sale, including the trustee's compensation for making the sale.

The Tompkins partnership acted in good faith in the matter for the purpose of preventing an even greater loss and not with the view of avoiding taxes. In its income tax return for 1932, the Partnership claimed a deductible loss in the amount of $43,200 on account of the transaction aforesaid. The Commissioner on final audit of the return disallowed that loss, thereby increasing the distributive shares of the partners, petitioners herein, which caused the deficiencies in issue in these proceedings.

Thereafter the Tompkins filed petitions with the Board of Tax Appeals praying a redetermination of the deficiencies and a reversal of the ruling of the Commissioner in disallowing the alleged loss of $43,200. The Board denied the petitions and held, in substance, that the Tompkins partnership neither sold nor otherwise disposed of the ⅔ interest in the real estate, but in fact merely acquired the remaining ⅓ interest and thereby became the sole owner of the entire property. The Board in its opinion said:

"All they (petitioners) had invested originally and later, now became their cost of the entire property. Whether they will suffer loss or realize gain from this entire investment will only be known when they dispose of the property. Petitioners say that they disposed of one 'equity' and acquired another. But they had a continuous interest in the property and the intervention of the new deed after foreclosure did not operate to break their tenure but only to give them an enlarged estate. Cf. J. C. Hawkins v. Com'r, 34 B. T. A. 918, affirmed per curiam, * * *". 5 Cir., 91 F.2d 354.

Petitioners urge that the Board erred in failing to hold that the transaction between the partnership and the corporation was a single joint venture upon the termination of which in 1932 petitioners suffered a deductible loss and in holding that petitioners had a continuous ⅔ interest in the property, that foreclosure and sale under the deed of trust merely operated to vest the other ⅓ interest in petitioners, and that their gain or loss on the ⅔ interest cannot be ascertained until petitioners finally dispose of that interest.

 1. We think the circumstances disclosed by the evidence show that this was a joint venture between the Partnership and the Corporation for the purpose of profit. The nature and purpose of the business in which petitioners, the partnership, were engaged generally; the absence of any interest by the partnership or any of its members in the corporation and of any showing or suggestion that the corporation or any of its officers or stockholders were interested in the partnership; the well known object of a real estate corporation such as McPherson Square Corporation, all of the stock in which was owned by a brokerage company; the fact that this was the only transaction ever entered into between the partnership and the corporation and the nature of the transaction itself, in the absence of affirmative proof to the contrary, justify the conclusion that the object of the purchase and holding of the property by the partnership and the corporation constituted a single special joint adventure the purpose of which was profit. In Dexter & Carpenter v. Houston, 4 Cir., 1927, 20 F.2d 647, at pages 651, 652, it was said:

"'A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." * * * It is purely the creature of our American courts.' 33 C. J. 841. A joint adventure has also been termed 'commercial enterprise by several persons jointly'. Joring v. Harriss (C.C. A.) 292 F. 974.

"A joint adventure partakes of the nature of a partnership for a certain specific purpose, but does not have all the

qualities of a partnership. 'A "joint adventure" may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefits; they each have the right to demand and expect from their associates good faith in all that relates to their common interest.' Jackson v. Hooper, 76 N.J.Eq. 185, 74 A. 130. See, also, Reid v. Shaffer (C.C.A.) 249 F. 553.

"In Van Tine v. Hilands (C.C.) 131 F. 124, an agreement to share equally commissions on the sale of certain stock was held to be a joint adventure. See, also, Berry v. Colborn, 65 W.Va. 493, 64 S.E. 636, 17 Ann.Cas. 1018.

"The complainants initiated this particular transaction, they and the defendant reached an agreement, to the joint enterprise each party agreed to contribute an equal sum of money, and the conclusion is inevitable that a joint adventure was entered into between the parties, the purpose being to secure the sole agency for the output of the J. B. B. mine, for the period of two years, complainants and defendant to share equally in the tonnage and commissions."

And see C. S. Osborn v. Com'r, 22 B. T. A. 935, 945, as follows:

"A joint venture is defined as: 'An association of two or more persons to carry out a single business enterprise for profit.' Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. [436] 440; Alderton v. Williams, 139 Mich. 296, 102 N.W. 753."

Also Clark v. Sidway, 142 U.S. 682, 690, 12 S.Ct. 327, 35 L.Ed. 1157; Blue v. Blue, 92 W.Va. 574, 116 S.E. 134, 137, 30 A.L.R. 1169; Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436; 15 R.C.L. 500; 33 C.J. 841. The terms of such an enterprise may be implied as well as express. In 33 C.J. 847, it is said:

"The usual requisites as to form and validity apply to a contract of this character. To constitute such a contract no particular form of expression or formality of execution is necessary. It need not be express but may be implied in whole or in part from the conduct of the parties."

The agreement between the Tompkins partnership and the Corporation fulfilled all the requisites of a joint venture although informal and apparently never reduced to writing. Cain v. Hubble et al., 1919, 184 Ky. 38, 211 S.W. 413, 6 A.L.R. 146, 151, is illustrative. The court said (page 416):

"In this case, the relations of the parties were more than joint tenants or tenants in common. The purchase of the lot and the erection of the building thereon was a joint adventure, or limited partnership, by Smith, Cain, and Hubble as partners, or else by Smith as one partner and Cain & Hubble as a partnership, and was made under a contract between them to purchase the land and to erect the building, and for which each of the parties was to pay an equal part; and, while not expressed in the contract, it must be assumed that each of them was to share equally in the rents thereafter to be collected, and to bear an equal part of the taxes, insurance, and repairs. Whether such a transaction is or is not a complete and full partnership it is not necessary to decide, as the rights and liabilities of the members of such an arrangement are such as govern and apply to a partnership, as was held in Crenshaw v. Crenshaw, supra, [61 S.W. 366, 22 Ky.Law Rep. 1782], and in many other cases, in this court where the association of the parties consisted of only one transaction, with such elements of a partnership as existed in this case. 23 Cyc. 457, 458; 15 R.C.L. 500."

2. It is clear also that when the Corporation defaulted in the payment of its part of the interest and taxes under the circumstances disclosed, petitioners had the right to terminate the enterprise. In 33 C.J. 849, 850, with respect to the right of party not in default to terminate the enterprise under such circumstances it is said:

"If either or any party to a joint adventure abandons or repudiates it, or wholly defaults in the performance of his part of the agreement, or if his entire interest in the enterprise is seized by a creditor, the other party or parties are not required to perform his or their part of the agreement and may, at their option, terminate the enterprise."

Also 15 R.C.L. 506, to the same effect. And the same volume of Corpus Juris at p. 854, as follows:

"*Foreclosure of mortgages.* Although joint adventurers cannot forfeit the vested interest of a member, they are under no obligation to protect it for him, and, if a mortgage on the joint property is foreclosed by reason of his failure to pay his share of the principal or interest due

thereon, and the property at the foreclosure sale is bought in by his associates, *they hold it thereafter freed from any claim or interest of his therein;* and it has even been held that, if the property is sold for less than the mortgage indebtedness and a deficiency judgment is entered against the joint adventurers, the fact that the member who paid the judgment was also the purchaser of the property does not estop him from claiming contribution from the others for their proportionate liability thereon." (Italics Supplied).

3. Did petitioners have a continuous ⅔ interest in the lands in question so that the sale under the deed of trust did not break the chain of title thereto but merely operated to vest the remaining ⅓ interest in petitioners?

We think an analysis of the facts stipulated will demonstrate that this query must be answered in the negative. Apparently the theory of the Commissioner is based upon the assumption that the sale and transfer of title was under the control of petitioners and that what occurred was in effect merely a sale to themselves of the ⅓ interest. While the trustee, no doubt, was in a sense the representative of both the grantor and the secured creditor in executing the trust, it cannot fairly be said that the trustee's acts were acts performed as agents of the petitioners. The trustee acted independently pursuant to the demand of the secured creditor and his acts in that respect were beyond the control of petitioners. And in bidding at the trustee's sale petitioners exercised a right which was open to the public generally upon the same terms and conditions that it was open to the petitioners.

The title to the entire property which petitioners now hold was derived by them through the trustee under the deed of trust as a result of the sale on September 23, 1932. The title which they and the corporation derived through the former owner by the deed given in 1928, was completely wiped out by the trustee's sale and any one who purchases the property from petitioners will of necessity have to trace title to the entire property through the trustee back to the former owner who gave the deed of trust and to a time (May 15, 1926) which antedates by about two years the conveyance (in 1928) by that owner to petitioners and the corporation. Thus the conveyance of the property to petitioners

and the corporation and the sale by the trustee under the deed of trust were separate transactions. See E. S. Phillips v. Com'r, 9 B. T. A. 1016; J. M. Dickinson, Jr. v. Com'r, 18 B. T. A. 790, 794; I. M. Davis v. Com'r, 2 B. T. A. 359. Furthermore, in assuming the payment of the deed of trust obligation, petitioners merely become debtors of the Insurance Company and the latter their creditor and that is the only relation that ever existed between them prior to the trustee's sale. Through the trustee's sale the original obligation was extinguished and pursuant to a new agreement another deed of trust was made to other trustees to secure new notes.

At the sale the petitioners were the successful bidders for the entire property at $79,000, but there is no suggestion in the evidence that their bid or undertaking was for anything in excess of that amount. To say that this bid in reality amounted to $79,000 plus $43,200 is to go in the teeth of the facts. In substance as well as in form, the trustee's sale and petitioners bid resulted in the transfer of the entire property for $79,000. When the property was knocked down to them, petitioners become obligated to pay $79,000 for the entire property. The trustee, acting for the creditor secured, not for petitioners, was in duty bound to collect and secure that amount. He could not collect less without a breach of his duty as trustee and he had no semblance of right to collect or secure the payment of more than $79,000. That was the transaction between the trustee and petitioners, dealing at arm's length pursuant to a public sale duly and legally held. It seems apparent, therefore, that the sale and conveyance of the entire property by the trustee to petitioners under these circumstances effectually and finally put an end to the joint venture in which petitioners lost $43,200 and McPherson Square Corporation ⅔ of that amount or $28,800. The partnership had invested $43,200 cash in the joint venture, the investment was a total loss and it is not clear why the failure of the joint adventurers as such to file a return in 1932 alters the situation as suggested in Respondent's brief.

In no real sense can it be said that this was a loss "sustained through the mental processes by which a taxpayer determines that the property is worthless and charges it off on its books, while it still retains the title to the property itself", as in

Greenleaf Textile Corporation, 26 B. T. A. 737, 740. On September 23, 1932, a definite, identifiable event occurred by which all the right, title and interests of the joint adventurers, the partnership and the Corporation, in the property was extinguished and a new and different ownership came into existence. That is all the statute and regulations require.[1] See U. S. v. S. S. White Dental Mfg. Co., 274 U. S. 398, 401, 47 S.Ct. 598, 600, 71 L.Ed. 1120, as follows:

"The case turns upon the question whether the loss, concededly sustained by the respondent through the seizure of the assets of the German company in 1918, was so evidenced by a closed transaction within the meaning of the quoted statute and treasury regulations as to authorize its deduction from gross income of that year. The statute obviously does not contemplate and the regulations (article 144) forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer. New York Life Ins. Co. v. Edwards, 271 U.S. 109, 116, 46 S.Ct. 436, 70 L.Ed. 859, cf. Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923. But with equal certainty they do contemplate the deduction from gross income of losses, which are fixed by identifiable events, such as the sale of property (articles 141, 144), or caused by its destruction or physical injury (articles 141, 142, 143), or, in the case of debts, by the occurrence of such events as prevent their collection (article 151)."

See, also, Denman v. Brumback, 6 Cir., 58 F.2d 128; Shoenberg v. Commissioner, 9 Cir., 77 F.2d 446, 447.

We do not think there is any conflict between these conclusions and the decision in J. C. Hawkins v. Com'r, 34 B. T. A. 918, affirmed 5 Cir., 91 F.2d 354, cited in the Board's opinion and relied on by Respondent. In that case a mortgagor of California real estate sought in his 1932 return to deduct a loss occasioned by the foreclosure of a mortgage which occurred November 24, 1931. Under the law of California the mortgagor had 12 months from the day of sale within which he could redeem the land and the redemption period had not expired when the taxpayer filed his return for 1931. The purchaser at the mortgage sale did not receive a deed for the property and was not entitled to one until after the expiration of the redemption period and the failure of the mortgagor to redeem. See Huntington v. Perrin, 65 Cal.App. 20, 223 P. 94, and Hawkins v. Com'r, 34 B. T. A. 918, 920, 921. Had the mortgagor redeemed within that period he would not have received a new deed from the officer who conducted the sale under the mortgage. In other words, in the event of redemption the mortgage sale became a mere nullity and the mortgagor still held title as of his former estate and not through the mortgagee or the officer who conducted the sale, a very different situation from that in this case. Under the provision of the California law the transaction never became a closed identifiable event until after the redemption period expired. Before the expiration of that period it could not be said with certainty that the mortgage sale would ever become final and binding and the purchaser receive a deed for the property on which the taxpayer sought to deduct a loss.

The situation here presented is not that of a mortgagor who permits a sale of mortgaged property under a mortgage or deed of trust, buys it in at the mortgage sale and then attempts to take a deduction for the difference between the cost of

---

[1] Revenue Act of 1932, c. 209, 47 Stat. 169, 180:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions: * * *

"(e) Losses by individuals. Subject to the limitations provided in subsection (r) of this section in the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) If incurred in trade or business; or

"(2) If incurred in any transaction entered into for profit, though not connected with the trade or business; * * * * " 26 U.S.C.A. § 23(e).

Treasury Regulations 77, promulgated under the Revenue Act of 1932:

"Art. 171. Losses:

"(a). Incurred in a taxpayer's trade or business or

"(b). Incurred in any transaction entered into for profit.

"Losses must usually be evidenced by closed and complete transactions. The basis for determining the amount of the deduction for losses is the same as is provided in section 113 for determining the gain or loss from the sale or other disposition of property. * * * "

402

the property and the amount realized upon the sale. In such case the sale might well be disregarded for income tax purposes, for the reason that the mortgagor continues to hold the property originally purchased and gain or loss is not realized until it is finally disposed of by him. Here there was not a continuation of the old status of the holder of the property, but the old status was closed by an identifiable event having no relation to tax avoidance and an entirely new relationship with respect to the property was commenced. The loss on the original venture was liquidated for taxpayers in the same way as was the loss of the other party to the venture; and the purchase of the property was a new and distinct undertaking with reference to which future gain or loss should be reckoned.

For the reasons stated, we conclude that the Tompkins partnership in September 1932 sustained a loss of $43,200 in the joint venture with the McPherson Square Corporation, that this loss was definite and final, and was evidenced by a closed identifiable event, that the Commissioner erred in not allowing the loss to be deducted in the partnership return for that year, and that the orders of the Board appealed from should be reversed.

Reversed.