MAX A. BURDE AND BERTHE C. BURDE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BERNARD WEISS AND PEGGY S. WEISS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1364–62, 1365–62.   Filed November 30, 1964.

*Albert A. Wedeen, E. Michael DiFabio,* and *Robert J. Wolpert,* for the petitioners.

*Leon M. Kerry,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the income taxes of petitioners Max A. and Berthe C. Burde and petitioners Bernard and Peggy S. Weiss for the calendar year 1958 in the respective amounts of $7,215.48 and $7,093.14.

These proceedings have been consolidated.

The sole issue remaining for decision is whether the royalty payments received by petitioners Max A. Burde and Bernard Weiss in 1958 were taxable as long-term capital gain.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioners Max A. and Berthe C. Burde were, at all times relevant hereto, husband and wife.   They filed their joint income tax return for 1958, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue, Upper Manhattan, New York.   Petitioner Max A. Burde will hereinafter be referred to as Burde.

---

[1] The petitioners in docket Nos. 1364–62 and 1365–62 have conceded the correctness of certain minor adjustments made in their respective taxable incomes for the year in question.

Petitioners Bernard and Peggy S. Weiss were, at all times relevant hereto, husband and wife. They filed their joint income tax return for 1958, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue, Brooklyn, N.Y. Petitioner Bernard Weiss will hereinafter be referred to as Weiss.

Burde and Weiss have, since 1940, been partners engaged in the business of selling drugs, cosmetics, toiletries, and related products to drug and department stores on behalf of manufacturers. The name of their partnership is Keystone Co. (hereinafter referred to as Keystone). In the course of their activities in this business they became acquainted with an individual named Martin F. Emory (hereinafter referred to as Emory).

Emory, Burde, and Weiss are not related to each other by blood or in law.

Emory has been connected, in one way or another, with the promotion and sale of cosmetics, toiletries, and pharmaceutical products since the mid-1940's. Although Emory did not, at any time relevant hereto, possess any formal scientific or pharmaceutical training, he has been interested in the development of new products in the above-mentioned fields. Burde, Weiss, and Emory have, at least upon one occasion prior to the transactions hereinafter described, been associated in a business venture. That venture, which was conducted in the form of a corporation, known as Sardeau, Inc. (hereinafter referred to as the corporation), involved the sale or distribution of relatively expensive perfumes to retail stores. That business proved unsuccessful, and Burde and Weiss discontinued their association with it in 1953. Their wives, however, formed a partnership with Emory to continue said business. That partnership will hereinafter be referred to as Perfume Co. The corporation through which the perfume business had theretofore been conducted remained in existence solely because of the fact that its annual State franchise taxes continued to be paid.

In the early part of April 1954, Emory contacted Burde and Weiss with regard to a bath oil formula he had conceived. Emory proposed to transfer to each of them a one-third interest in the formula in return for their promise to pay all of the development costs, including any possible legal and patent fees, the cost of a chemist, and the production costs of a commercial batch of the bath oil. In the latter part of that month, Burde and Weiss accepted Emory's offer. It was estimated that Burde and Weiss would probably incur costs of approximately $12,000 in connection with the commercial development of the bath oil, consisting of $1,000 for attorney fees in connection with a patent application, $1,000 for other legal fees, $500 to be paid to a chemist for producing samples of the product, $5,000 or $6,000 as the

cost of producing a 50-gross commercial batch, and $2,000 to $3,000 for laboratory testings of the product. It was contemplated from the very outset of their agreement that Burde and Weiss would finance Emory in connection with the development of the bath oil and that after the oil had been sufficiently developed they would sell the formula and the bath oil invention to some large cosmetic manufacturer.

Emory's bath oil formula, which subsequently became known as Sardo, consists of a unique combination of five oils, each of which by itself is not an unusual product or ingredient. At the time Burde and Weiss orally accepted Emory's offer, Emory had made no effort to develop this product. Prior to that time he had never even attempted to make a sample of the bath oil. In fact, Emory had not found it necessary to reduce the formula to writing prior to that time since he had committed the elements of the formula to memory.

In May 1954, Burde and Weiss brought Emory to their attorney, explained the terms of their agreement to the attorney, and requested him to reduce their agreement to writing. Burde and Weiss advised the attorney that any services rendered in connection with the bath oil formula or requested by either of them or by Emory should be billed to Burde and Weiss personally and that Emory would not bear any part of the legal fees.

In June 1954, Burde and Weiss contacted a chemist and retained him to prepare samples of the bath oil. Emory conferred with the chemist and revealed the bath oil formula to him. The chemist in August of that year delivered six 4-ounce samples to Emory. Emory, Burde, and Weiss, as well as members of their immediate families, made personal tests of the samples.

During the summer of 1954, Emory, Burde, and Weiss, at the suggestion of Burde's and Weiss' lawyer, conferred with a firm of patent lawyers concerning the advisability of applying for a patent on the bath oil formula. At this meeting Weiss advised the patent attorneys that all services rendered and disbursements made in connection with the bath oil invention should be billed to Burde and Weiss personally or to their partnership, Keystone. The patent attorneys were of the opinion that the formula was patentable and that Emory, Burde, and Weiss might have a better chance of selling the formula to some large cosmetic manufacturing company if it were patented. They held discussions concerning the filing of a patent application upon a number of occasions during that summer. In connection therewith, the matters of patent infringement and protecting the formula were discussed. In the early part of December 1954, it was finally decided that an application for a patent would be filed.

On December 21, 1954, Burde, Weiss, and Emory executed a written agreement memorializing their oral agreement of April 1954. There was no basic difference between the April 1954 oral agreement and

the December 21, 1954, written agreement. That agreement provided, in pertinent part, as follows:

WHEREAS [Emory] has with the cooperation and aid of [Burde and Weiss] invented a formula for a bath oil which is also a remedy against dry skin and skin irritation, which invention also consists of a new use for a compound of previously known ingredients, and;

WHEREAS the parties hereto have previously orally among themselves agreed on their respective interests in said inventions and are now desirous of reducing their said agreement to writing;

Now, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. [Emory] hereby assigns, transfers and sets over unto [Burde and Weiss] two-thirds of all his right, title and interest in and to the inventions aforementioned, namely the formula for said oil, the process of manufacturing the same, and the new use thereof, all of which are now known to all the parties.

To HAVE AND TO HOLD such inventions and income therefrom and rights thereto, to [Burde and Weiss], one-third thereof to each, their heirs and assigns for their own use and behoof, forever.

2. [Emory] hereby further agrees to file or cause to be filed in the United States Government Patent Office in his own name, an application for letters patent to said inventions and to execute all necessary papers and documents required in connection therewith, now being prepared by [certain patent lawyers].

3. [Emory] further agrees that immediately upon his receipt of a serial number in connection with such application to the United States Patent Office, he will execute and deliver to each of [Burde and Weiss], an assignment of said invention or inventions and patent applications in proper recordable form as required by the said United States Patent Office for a one-third interest in said application for patent or applications for patents, and to any patent or patents that may be issued thereunder.

4. [Emory, Burde, and Weiss, each] further agrees that he will at no time and in no wise transfer or encumber his one-third interest in said invention or inventions and in said patent application or applications, or any patent or patents that may be issued thereon, without the consent of the other parties.

5. [Burde and Weiss] agree that they will continue to finance the invention or inventions aforementioned, and that they will pay all bills due and to become due to [certain patent lawyers] in connection with the preparation of said patent application or applications, and in connection with the prosecution thereof, and will also pay all bills due or to become due to any chemist or chemists that has aided in the perfection of the said invention and in reducing the ingredients thereof to commercially marketable form.

6. This agreement shall inure for the benefit of, and shall be binding upon, the heirs, assigns and representatives of the parties here.

As of December 21, 1954, when the oral agreement of April 1954, between Emory, Burde, and Weiss, was reduced to writing, only three sets of samples of the bath oil had been produced. No tests, other than those made through personal use by Emory, Burde, and Weiss and members of their immediate families had been conducted. Although a 200-gallon commercial batch of the bath oil had been ordered as of that time, it had not been prepared until sometime in the first week of January 1955. In the absence of a "commercial run," it was not cer-

tain that the bath oil could be satisfactorily produced in large quantities. No laboratory tests were possible without a commercial batch. Until laboratory tests were conducted it could not be known how the bath oil would stand up as to efficiency, shelf life, or therapeutic value.

In the latter part of December, after the agreement between Emory, Burde, and Weiss had been reduced to writing, Emory met with his own lawyer to show him a copy of the agreement. Emory also mentioned that he was then interested in producing and marketing the bath oil himself, instead of merely selling the bath oil formula to some large cosmetic company as had been previously agreed among Emory, Burde, and Weiss. The lawyer advised Emory to discuss the matter with Burde and Weiss.

On January 2, 1955, Emory met with Burde, Burde's wife, Weiss, and Weiss' wife and advised them of his interest in producing and marketing the bath oil himself rather than selling the invention to a manufacturer. It was finally decided that in return for a royalty, to be fixed between 5 and 7 percent at a later date when producing costs were ascertained, Emory, Burde, and Weiss would transfer their rights in the bath oil formula to a newly formed partnership consisting of Emory, Burde's wife, and Weiss' wife.

On January 2, 1955, Emory, Burde's wife, and Weiss' wife formed a new partnership known as Sardo by Sardeau (hereinafter referred to as the partnership). Each partner was to contribute $5,000 in return for an equal one-third interest therein.

Samples of the commercial batch of the bath oil were delivered to Emory during the first week in January 1955. The samples were packaged and bottled when received. Without waiting for laboratory tests to be conducted thereon, Emory delivered some of the samples to Weiss and requested Keystone to solicit orders for the bath oil on a commission basis. On January 6, 1955, Weiss obtained an order for 10 gross of the bath oil from a large New York department store.

During the latter part of January 1955, the department store placed additional orders for 35 gross of the bath oil. The department store reordered the bath oil, generally by telephoning Keystone or the partnership directly. The partnership filled these orders out of the 50-gross commercial batch which had been ordered for testing. As of January 7, 1955, when the first order was shipped to the department store, no commercial or laboratory tests had been conducted on the commercial batch of the bath oil.

On January 12, 1955, Emory, Burde's wife, and Weiss' wife executed and acknowledged a business certificate for partners, setting forth that they were conducting or transacting business as members of a partnership under the name or designation of Sardo by Sardeau.

The certificate was filed in the office of the county clerk of New York County on January 20, 1955.

On February 12, 1955, Emory executed and acknowledged a patent application covering the bath oil formula. This application was duly filed with the U.S. Patent Office on February 14, 1955, and assigned serial No. 488,157. On May 31, 1955, Emory executed separate assignments transferring to both Burde and Weiss a one-third interest in this patent application and in any patent or patents, including improvements thereon, that might be issued thereunder. The bath oil formula and the method of producing the bath oil constitute a patentable invention, and Emory is the inventor thereof.

In May 1955 it was agreed that the royalty to be paid to Emory, Burde, and Weiss by the partnership should be fixed at 6 percent of the net sales commencing January 1, 1956, and that a flat payment of $2,500 would be made for all sales in 1955. On May 31, 1955, a written agreement was entered into between Emory, Burde, and Weiss, on the one hand, and the partnership, on the other hand. This agreement provided, in pertinent part, as follows:

THIS AGREEMENT made this 31st day of May, 1955, by and between MAX BURDE, MARTIN F. EMORY and BERNARD WEISS, all hereinafter designated jointly as the "LICENSORS" and MARTIN F. EMORY, [Burde's wife] and [Weiss' wife], co-partners doing business as SARDO by SARDEAU, * * * hereinafter jointly designated as the "LICENSEES",

WITNESSETH:

WHEREAS the Licensors have devised and are now and have been for some time the sole and exclusive owners of an invention which consists of a formula and a processing method for a preparation to be used in the bath which is also a remedy against dry skin and skin irritation, and which invention also consists of a new use for a compound of previously known ingredients; and

WHEREAS the Licensors are now the owners of a patent application covering such invention filed in the United States Patent Office on the 14th day of February, 1955 and which bears Serial Number 488157; and

WHEREAS the Licensors have previously disclosed the formula, its salient features and method of use to the Licensees and have permitted the latter to use and market the same for the purpose of determining the marketability and commercial value thereof; and

WHEREAS the Licensees desire to acquire from the Licensors an exclusive license to manufacture and market the aforementioned invention throughout the United States, its territories and possessions, which invention the Licensees have heretofore marketed under their trade mark "SARDO"; and

WHEREAS the Licensors are desirous of granting to the Licensees such exclusive license upon such terms and conditions as are hereinafter contained;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. The Licensors hereby grant unto the Licensees and the Licensees hereby accept, the exclusive use, right and license to manufacture and sell preparations embodying, employing and containing the invention or inventions claimed by the Licensors in their application filed in the United States Patent Office on the 14th day of February, 1955 and which bears Serial Number 488157 of said U.S. Patent

Office and the inventions claimed by the Licensors under any application or amendment filed or to be filed by the Licensors on any of the said features, arts or improvements of the inventions contained in the aforesaid application, including any reissues or extensions of the foregoing; the Licensors also hereby grant unto the Licensees and the Licensees hereby accept the exclusive right to sublicense the aforementioned rights granted to the Licensees. The aforesaid exclusive rights shall be subject only to the terms, conditions and limitations hereinafter contained.

2. The Licensors hereby covenant and agree that they will diligently prosecute their aforesaid application for letters patent and any amendments filed or to be filed thereto at their own cost and expense; and the Licensees in their discretion hereby agree to assist the Licensors in any proper effort to expedite action on the aforesaid application.

3. The parties hereto shall have the rights granted to them under this agreement for the period commencing June 1, 1955 to the full end of the term or terms for which any letters patent as provided in Paragraph "1" hereof, may be granted, including any reissue or extensions thereof, unless such rights are extended or terminated as may be provided herein.

4. For the rights herein granted to the Licensees by the Licensors, the Licensees agree to pay the Licensors on the terms and conditions hereinafter set forth, the sum of Two Thousand Five Hundred ($2,500.00) Dollars on or before the 31st day of July, 1955. In addition, the Licensees shall pay the Licensors a sum equal to six percent (6%) of the net selling price of all goods to be sold by the Licensees from and after January 1, 1956.

     *        *        *        *        *        *        *

6. Notwithstanding the foregoing provisions, in the event that the Licensees sublicense the right to the inventions, or any part of them, covered by this agreement, to a person, firm or corporation other than a subsidiary of the Licensees, the Licensees shall pay to the Licensors fifty percent (50%) of the net income actually received by the Licensees for such sublicense.

7. Royalties received by the Licensees from a sublicense shall be paid to the Licensors within thirty (30) days after receipt of same but in the amount hereinbefore provided. All other royalties shall be payable by the Licensors to the Licensees quarterly, no later than the thirtieth (30) day of January, April, July and October or [sic] each and every year for the three (3) month period terminating on the last day of the month next preceding the month in which royalties are to be paid as herein provided.

8. Royalties herein provided to be paid shall be payable by the Licensees one-third (⅓) to each member of the Licensors, or their heirs and assigns and shall be mailed to such address as each member of the Licensors shall advise the Licensees in writing.

9. The Licensees shall render and deliver to the Licensors with each payment of royalties aforementioned, a full and accurate statement in writing of all sales of merchandise made during the preceding quarter, including a record of net income received from sub-licensees herein.

10. Notwithstanding any provision hereinbefore contained, this agreement shall be in full force and effect so long as the Licensees or their successors and assigns shall market a product containing any inventions, features, improvements or uses which are referred to in Paragraph "1" hereof.

It is intended that royalty payments shall be due in such event regardless of whether a patent or patents, are issued to the Licensors and that such payments shall in such event continue beyond the expiration of such patent or patents or reissues thereof.

11. The Licensors agree to disclose to the Licensees and make available for use by the Licensees any improvements or modifications of the invention of the Licensors whether the same be the subject of a patent application or not.

12. Notwithstanding any provision herein contained, the Licensees agree to pay to the Licensors a minimum annual royalty of Six Thousand ($6,000.00) Dollars per annum.

13. The Licensees agree to keep true and correct books of account in which shall be entered all income received by it from sublicensees hereunder and all sales by it or by its subsidiaries, of goods which are subject to the term of this agreement, and such books of account, during all business hours, shall be open to the examination and inspection of the Licensors or their duly authorized representative.

14. Upon the failure of the Licensees to keep true and accurate books of account, or upon the failure of the Licensees to permit the Licensors, or their duly authorized attorney, to examine and inspect the same, or upon the failure of the Licensees to render and deliver a full and accurate statement in writing of all goods manufactured and sold by it, which contain any inventions or improvements which are hereinbefore referred to, or upon the failure of the Licensees to pay the full amount of license fees herein required to be paid, as and when the same shall become due, then and in any such event, this agreement shall cease and terminate, at the option of the Licensors, by the service of a written notice upon the Licensees, but the Licensees shall not thereby be discharged from any liability to the Licensors for any license fees due at the time of the service of such notice.

The partnership produced and sold the bath oil during 1955. It had net sales that year in the amount of $342,244.46. On July 19, 1955, the partnership, pursuant to paragraph 4 of the above agreement, paid a total of $2,500 to Emory, Burde, and Weiss as follows: $833.33 to Emory, $833.34 to Burde, and $833.33 to Weiss.

In December 1955, Emory, Burde's wife, and Weiss' wife decided to transfer the assets and business of the partnership to the corporation, which had been dormant, in return for stock therein.

Pursuant to a letter dated December 30, 1955, Emory, Burde's wife, and Weiss' wife made the following offer to the corporation:

We the undersigned, the owners of the companies known as Sardo by Sardeau [the partnership] and Sardeau Company [Perfume Co.], hereby make the following offer:

1. We agree to transfer all the assets we own in both of our aforementioned companies to you in consideration of your corporation issuing to the undersigned, or our designees, a total of eighty (80) shares of your capital stock, one-third (⅓) to each of us or our designees.

2. Among our assets, Sardo by Sardeau [the partnership] will assign to you its rights under a licensing agreement for a license to manufacture the product "Sardo" [the bath oil], which agreement is dated May 31, 1955, as well as the trademark "Sardo". We agree to get the consent of the licensors mentioned in that agreement to such assignment.

3. You are to undertake to pay all current debts and obligations of both our aforementioned companies, if you accept this offer, and to abide by our obligations under said licensing agreement.

4. Whenever you accept this offer, it shall be deemed to have been accepted and effective as of January 1, 1956.

The offer to the corporation was accepted at a combined meeting of the stockholders and directors of said corporation, duly held on December 30, 1955, by the following resolution:

RESOLVED: That the Corporation accept the offer of Sardo by Sardeau [the Partnership] and Sardeau Company [Perfume Co.] as herein stated before and that the President be and he is hereby authorized to sign the necessary papers to consummate the transaction, and that the Treasurer is hereby authorized to issue eighty (80) shares of stock of the Corporation to the said owners of said companies as provided in said offer, and that the Corporation undertake to pay the debts and obligations of said companies as in said offer provided, and that the transfer of said assets and the delivery of the stock of the Corporation be made on January 2nd, 1956.

Emory, Burde, Weiss, Weiss' wife, and an individual named Herbert Greenwald were present at that meeting. Each of these individuals also executed a waiver of notice with respect to that meeting which provided, in pertinent part, as follows: "We, the undersigned, being all of the stockholders and members of the Board of Directors of [the Corporation] * * *."

On January 2, 1956, Emory, Burde's wife, and Weiss' wife each received from the corporation 26⅔ shares of its stock. Thereafter the outstanding shares of stock in the corporation were held as follows:

| Shareholder | Number of shares | Percent of outstanding stock |
| --- | --- | --- |
| Burde's wife | 56⅔ | 28⅓ |
| Weiss' wife | 56⅔ | 28⅓ |
| Emory | 66⅔ | 33⅓ |
| Herbert Greenwald | 20 | 10 |
| Total | 200 | 100 |

After January 1, 1956, the corporation conducted the bath oil business formerly carried on by the partnership. In so doing, the corporation assumed the partnership's obligations under the agreement of May 31, 1955, to make royalty payments to Emory, Burde, and Weiss. The partnership ceased to conduct business after December 30, 1955, and filed a final partnership return for 1955.

Neither the partnership nor the corporation has ever made any sales of the bath oil outside of the United States. Emory was unsuccessful in his attempts to interest firms in Canada and France in marketing the bath oil.

Subsequent to the filing of the original patent application on the bath oil, a "continuation in part" application was filed with the U.S. Patent Office in connection with the bath oil invention in July 1957. This application was assigned serial No. 668,864. A second "continuation in part" application was filed in September 1959 and was assigned serial No. 841,601. On August 13, 1963, the U.S. Patent Office issued a formal notification that Emory's application for a patent covering the bath oil described in application No. 841,601 had been

allowed and a notice of allowance would be sent in due course. The notice of allowance regarding the bath oil was sent to Emory on February 7, 1964. The bath oil described in patent application 841,601 is the same bath oil invention for which Emory filed the original patent application in 1955.

During 1958, pursuant to the terms of their agreement of May 31, 1955, with the partnership (which agreement had been assumed by the corporation), Emory, Burde, and Weiss each received from the corporation royalty payments in the amount of $19,484.33. Burde and Weiss each reported the royalties received by them (less certain expenses attributable thereto) as long-term capital gain.

Respondent, in separate statutory notices of deficiency to Burde and Weiss, determined that, pursuant to the provisions of section 61, the payments received by each of them constituted royalty income and were includable in their entirety in Burde's and Weiss' respective gross incomes for the taxable year ended December 31, 1958. It was further noted in each deficiency notice:

Inasmuch as you have reported the above royalty income as a long-term capital gain in the reduced amount of $9,325.67 (50% of $18,651.33) on your return for the taxable year ended December 31, 1958, the difference of $9,325.67 is hereby restored to gross income by this adjustment.

## OPINION

It is contended on behalf of Burde and Weiss that their transfer of their respective one-third interests in the bath oil invention to the partnership qualifies under section 1235 [2] and that they are therefore entitled to report as long-term capital gain the royalty payments received by them in 1958 in consideration for said transfer.

Section 1235 provides, in essence, that a transfer of all substantial rights to a patent, or of an undivided interest in all such rights to a patent, by a holder shall be considered as the sale or exchange of a capital asset held in excess of 6 months regardless of whether the payments made in consideration of such transfer bear a general resemblance to the payment of royalties.[3] The special long-term capital

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as it appeared during the year in issue.

[3] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduc-

gains treatment afforded by section 1235 is specifically denied where the transfer is between related persons. See sec. 1235 (d).[4]

Respondent apparently concedes that Burde and Weiss transferred substantially all of their rights in the bath oil invention; for he did not attempt to challenge or refute petitioner's contentions that they did divest themselves of substantially all of their rights in the invention by virtue of their agreement with the partnership.

As we view the facts in this case, however, Burde and Weiss are not entitled to claim the special treatment of section 1235 because they are deemed to have transferred their respective interests in the bath oil invention to their wives who are related persons within the meaning of section 267 (b) and (c).[5] Burde and Weiss claim that they transferred their respective interests in the bath oil invention to the partnership. However, in *George N. Soffron*, 35 T.C. 787, 789 (1961), we upheld section 1.1235–2 (d) (2) of the Income Tax Regulations which provides that, for purposes of section 1235, a partnership cannot be a holder of a patent (or an invention), but that each individual member of the partnership must be regarded as the holder of his share of the patent (or invention) owned by the partnership. Since the partnership cannot be regarded as the holder of the bath oil invention after the transfer, for purposes of section 1235, we must regard the invention as owned in equal shares by the members of the partnership, namely, Emory, Berthe Burde (Burde's wife), and Peggy Weiss (Weiss' wife). Looking at the transaction from this standpoint, we find that (1) prior to the transfer of the bath oil invention, Emory, Burde, and Weiss each were holders of a one-third interest therein and (2) immediately after the transfer Emory, Berthe, and Peggy each were owners of a one-third interest in said invention. We be-

---

tion to practice the invention covered by the patent, if such individual is neither—
    (A) the employer of such creator, nor
    (B) related to such creator (within the meaning of subsection (d)),
  (c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

Although sec. 1235 by its terms refers to the sale or exchange of patents, the invention need not be patented at the time of the transfer for that section to be applicable. *F. H. Philbrick*, 27 T.C. 346, 356 (1956) ; and *Estate of Milton P. Laurent, Sr.*, 34 T.C. 385, 399 (1960).

[4] SEC. 1235. SALE OR EXCHANGE OF PATENTS.—
  (d) RELATED PERSONS.—Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in section 267(b)), except brothers and sisters, whether by the whole or half blood.

[5] SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.
  (b) RELATIONSHIPS.—The persons referred to in subsection (a) are:
    (1) Members of a family, as defined in subsection (c) (4) ;
      *       *       *       *       *       *       *
    (c) (4). The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants ; * * *

lieve that, under the particular circumstances of this case and in view of the legislative history of the applicable statutory provisions, we are justified in treating the partnership as an aggregate of individuals, rather than as an entity. When Congress enacted section 1235 into law, it clearly indicated that it did not want the benefits of capital gains treatment to be available in connection with sales of patents within essentially the same economic group. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 441 (1954), and H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A281 (1954). We must, therefore, interpret section 1235 in accord with this manifest legislative intent.

Although Congress, under the 1954 Code, decided to treat partnerships for a number of purposes as entities,[6] it is clear that Congress did not intend to do so for all purposes under the Code. See the 1954 Conference Report wherein the following statement was made:

Both the House provisions and the Senate amendment [sec. 707] provide for the use of the "entity" approach in the treatment of the transactions between a partner and a partnership which are described above. No inference is intended, however, that a partnership is to be considered as a separate entity for the purpose of applying other provisions of the internal revenue laws if the concept of the partnership as a collection of individuals is more appropriate for such provisions. An illustration of such a provision is section 543(a)(6), which treats income from the rental of property to shareholders as personal holding company income under certain conditions. [Conference Report, p. 59.]

In view of the legislative history of section 1235, we believe that section is another provision of the Code under which it is more appropriate to treat a partnership as a collection of individuals rather than as an entity. On the basis of the foregoing we conclude that, for purposes of section 1235, Burde and Weiss each transferred their respective one-third interests in the bath oil to their spouses and that section 1235(a) is not applicable to their transfer.

Even if we were to assume that the transfer to the partnership had satisfied the literal requirements of section 1235, we would, nevertheless, be required to determine whether the transaction satisfied those provisions of the Code dealing with transactions between controlled partnerships (sec. 707) before holding that Burde and Weiss were entitled to capital gains treatment on their transfer. Petitioners contend that section 1235, because it specifically deals with patents, takes precedence over any more general provisions of the Code and is the exclusive arbiter of transactions literally falling within its ambit. Petitioners also argue that, because section 1235(d) specifically describes the class of persons to whom sales may not be made, capital gains treatment is available in the case of sales to any persons not included in that description.

---

[6] See, e.g., sec. 707 or sec. 741.

We believe these arguments are untenable in light of Congress' intention to prevent capital gains treatment in the case of sales of patents within essentially the same economic group. It is far more reasonable, in our opinion, to interpret Congress' omission in section 1235(d) of any reference to controlled partnerships to its belief that transfers of patents from or to partnerships would be governed by section 707 rather than to an intention to permit capital gains treatment upon sales of patents to controlled partnerships. It was necessary for Congress specifically to state that sales of patents between the persons described in section 1235(d) were not to qualify under section 1235(a); for there were no other Code provisions to prevent capital gains treatment in connection with such sales. However, because of the existence of section 707(b), it was not necessary for Congress to do so in the case of sales of patents involving partnerships. For this reason we believe that in order to qualify for capital gains treatment under section 1235, a transfer of a patent to a partnership must satisfy the provisions of section 707(b).

Section 707, which did not have any predecessor under prior law, was inserted into the Internal Revenue Code of 1954 to deal with transactions between partners and their partnership. In essence, section 707 provides that in such transactions the partnership is to be treated as an entity in and of itself, rather than as an aggregate of individuals, *except under certain specified conditions*. Section 707(b) describes certain of the specified conditions as follows:

(b) CERTAIN SALES OR EXCHANGES OF PROPERTY WITH RESPECT TO CONTROLLED PARTNERSHIPS— * * *

(2) GAINS TREATED AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221—

(A) between a partnership and a partner owning, directly or indirectly, more than 80 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of the capital interests or profits interests, any gain recognized shall be considered as gain from the sale or exchange of property other than a capital asset.

(3) OWNERSHIP OF A CAPITAL OR PROFITS INTEREST.—For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section.

Respondent apparently concedes that section 707(b)(2)(A) is not applicable to the transfer.

Respondent argues, however, that section 707(b)(2)(B) is applicable because Emory, Burde, and Weiss held the bath oil invention as joint venturers or partners prior to their transfer of it to the partnership. Respondent then contends that this transfer constituted

a sale or exchange "between two partnerships in which the same persons own, directly or indirectly, more than 80 percent" of each partnership within the meaning of section 707(b)(2)(B).

Petitioners Burde and Weiss concede that if this Court concludes that Emory, Burde, and Weiss held the bath oil invention as joint venturers, section 707(b)(2)(B) would be applicable to their transfer of said invention to the partnership.[7] Burde and Weiss, however, contend that their interest in the invention, together with that of Emory, represented nothing more than coownership.

Under sections 761 and 7701(a)(2) a joint venture is one of the various unincorporated associations included within the broad definition of a partnership "through or by means of which any business, financial operation, or venture is carried on."[8] The Code thus makes its own classification and prescribes its own standards for qualification as a "partnership," and, to the extent thereof, it super-

---

[7] The petitioners do not dispute the existence of the two other conditions which must be present in order for sec. 707(b)(2)(B) to be applicable to their transfer. The first condition is that the transaction must be "between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of the capital interests or profits interests." Because ownership for purposes of sec. 707(b)(2)(B) is determined in accordance with the rules of constructive ownership provided in sec. 267(c) (see sec. 707(b)(3)), Burde and Weiss each must be regarded as the owners of the interests in the transferee partnership (the partnership) owned by their respective wives. See sec. 267(b)(1) and (c)(4). Therefore, the applicability of these rules of constructive ownership requires us to treat the sale of the bath oil invention as having been made between two partnerships which are completely owned by the same persons or, in accordance with the statutory language, in which the same persons, directly or indirectly, own 100 percent of the capital interests and the profits interests.

As for the second condition, sec. 707(b)(2)(B) applies to the sale or exchange of "property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221." Burde and Weiss at no time contended that the bath oil invention constituted a capital asset in the hands of the transferee, the partnership, so as to exclude their sale from the scope of sec. 707(b)(2)(B). It is true that when the bath oil invention was transferred to the partnership (whether that transfer is regarded as having occurred when the invention was reduced to practice in the first week of January 1955 or on May 31, 1955, at the time the license agreement was executed), the invention did not constitute property subject to the allowance for depreciation. The reason therefor is because the invention did not have a determinable useful life. *Twin Disc Clutch Co.,* 2 B.T.A. 1327 (1925) ; and *Hershey Manufacturing Co.,* 14 B.T.A. 867, 876–877 (1928), reversed on other grounds 43 F. 2d 298 (C.A. 10, 1930) ; *Sarkes Tarzian, Inc.* v. *United States,* 159 F. Supp. 253, 256 (S.D. Ind. 1958). Thus, the bath oil invention would not have been excepted from the definition of "capital asset" by virtue of the exclusion in sec. 1221(2) for "property, used in [the] trade or business, of a character which is subject to the allowance for depreciation provided in section 167." Since Burde and Weiss concede that sec. 707(b)(2)(B) would govern the tax consequences of their transfer, if this Court were to find that they held the invention as joint venturers, we therefore assume that the bath oil invention was excluded from the definition of "capital asset" because, as held by the partnership, it constituted inventory, stock in trade, or property held primarily for sale to customers within the meaning of sec. 1221(1). Petitioners have the burden of proof in this case, and they have not carried their burden that the invention was not stock in trade. Therefore, in the event it were determined that Emory, Burde, and Weiss held the invention as joint venturers, sec. 707(b)(2)(B) would be applicable to their transfer of the invention to the partnership.

[8] SEC. 761. TERMS DEFINED.

(a) PARTNERSHIP.—For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture * * *

[Sec. 7701(a)(2) contains substantially the same language.]

sedes local law for income tax purposes. *Commissioner* v. *Tower*, 327 U.S. 280 (1946).

The Income Tax Regulations shed further light on the question. Section 1.761–1(a) (1) thereof provides, in pertinent part:

*The term "partnership" is broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships.* * * * A joint undertaking merely to share expenses is not a partnership. For example, if two or more persons jointly construct a ditch merely to drain surface water from their properties, they are not partners. Mere coownership of property which is maintained, kept in repair, and rented or leased does not constitute a partnership. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they *do not necessarily* create a partnership thereby. Tenants in common, however, may be partners *if they actively carry on a trade, business, financial operation, or venture and divide the profits thereof.* For example, a partnership exists if coowners of an apartment building lease space and *in addition provide services to the occupants either directly or through an agent.* [Emphasis supplied.]

See also sec. 301.7701–3, Proced. and Admin. Regs.

The term "joint venture" has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. *Beck Chemical Equipment Corporation*, 27 T.C. 840, 848–849 (1957); *Tompkins* v. *Commissioner*, 97 F. 2d 396, 398 (C.A. 4, 1938), reversing a Memorandum Opinion of this Court, which reversal was followed in *H. L. Rust, Jr.*, 38 B.T.A. 910 (1938). One of the characteristics of a joint venture is that it is usually formed to handle a single transaction rather than to carry on a continuing business. *J. Roland Brady*, 25 T.C. 682, 688 (1955).

The undisputed facts in the record show that Emory, Burde, and Weiss entered into a common type arrangement in 1954 for the purpose of making a profit through the development of the bath oil formula and its sale to a large cosmetic manufacturer. We must determine whether the relationship that existed between these individuals was that of joint venturers, on the one hand, or of coowners, on the other.

In determining for tax purposes whether a particular relationship between persons constitutes a partnership, the intent of the persons involved is, in the final analysis, the controlling factor. *Commissioner* v. *Tower, supra* at 286–287. Since intent is a subjective matter not readily discernible by a trier of fact, we are forced to rely upon the objective acts of Burde, Weiss, and Emory as evidence of their intent.

A review of the above-mentioned regulations and cases indicates that the most significant objective factor distinguishing a joint venture from mere coownership is the nature of the activities engaged in by the participants. Thus, fairly substantial activities indicate an

intent to join together for the purpose of conducting a joint business venture; whereas mere passive coownership of property is more generally regarded as negating any intent to conduct a business or engage in a venture for profit jointly.

Respondent has pointed to a number of factors which suggest to us that the activities conducted by Emory, Burde, and Weiss prior to their transfer of the bath oil invention to the partnership were of a substantial enough nature to disqualify them from the status of mere coowners of the invention and to place them within the classification of a joint venture so that they would come within the ambit of section 707 (b) (2) (B).

Thus, when Emory first approached Burde and Weiss in April 1954 concerning his formula, Emory had not made any effort to develop the bath oil. In fact, he never found it necessary to reduce the formula to writing, although he had memorized the various elements comprising it. When Burde and Weiss accepted Emory's proposition later in that month, the bath oil invention had not yet been reduced to practice. In fact, the petitioners testified, and we have found as a fact, that the bath oil invention was not reduced to practice until sometime during the first week of January 1955, after they had agreed to transfer their respective interests therein to the partnership. At the time Burde and Weiss accepted Emory's offer, it was agreed that in return for a one-third interest each, Burde and Weiss would finance Emory in the development of the bath oil invention. It was further agreed that after the bath oil had been sufficiently proved, they would attempt to sell it to a large cosmetic manufacturer. It was contemplated that Burde and Weiss would probably incur costs of approximately $12,000, consisting of $1,000 for attorney fees in connection with obtaining a patent, $1,000 for other legal fees, $500 to be paid to a chemist for producing samples of the product, $5,000 or $6,000 for producing a 50-gross commercial batch of the product, and $2,000 to $3,000 for laboratory tests thereon. It is true that at no time did Emory, Burde, or Weiss specifically agree that any of them was to devote any predetermined amount of time to the development of the bath oil. However, the evidence indicates that all three of them participated in the enterprise. Quite naturally, since Emory was the inventor of the bath oil, he devoted significantly more time to its development than did Burde and Weiss. However, the efforts and energies expended by Burde and Weiss in the development of the bath oil cannot, we believe, be described as mere passive ownership, but seem to us to have been substantial indeed. The record indicates that Burde and Weiss engaged a chemist to prepare samples of the bath oil. They, together with Emory, participated in a number of conferences concerning the advisability of attempting to patent the formula as opposed to keeping it as a trade secret. Because of the extensive background which

Burde and Weiss had in the field of selling drugs, cosmetics, toiletries, and related products to drug and department stores on behalf of manufacturers, we believe that we may properly infer that it was contemplated by Emory, Burde, and Weiss from the very outset of their association that Burde and Weiss would provide useful services or advice in the development and ultimate sale of this product. See *Paul L. Kuzmick*, 11 T.C. 288, 296 (1948) ; and cf. *Cleveland* v. *Commissioner*, 297 F. 2d 169 (C.A. 4, 1961), reversing in part 34 T.C. 517 (1960). Moreover, it is not a prerequisite to partnership status that each of the members devote substantially similar amounts of time and energy to the business of the partnership. Furthermore, it is immaterial that Burde and Weiss had business interests other than the development of the bath oil; for it is well recognized that one may engage in two or more businesses. *J. Roland Brady*, *supra* at 689.

Petitioners Burde and Weiss point to the absence in their agreement with Emory of a number of factors which they contend indicate that they did not own the bath oil invention as joint venturers. One such factor is that their agreement of December 31, 1954, did not specifically provide for the sharing of profits. However, we have found as a fact that from the very outset Emory, Burde, and Weiss contemplated that they would sell the bath oil to a large cosmetic manufacturer and divide the profits therefrom equally. Another factor mentioned by Burde and Weiss is that no partnership returns had been filed. Cf. *Lawrence Y. S. Au*, 40 T.C. 264 (1963), affirmed per curiam 330 F. 2d 1008 (C.A. 9, 1964). However, this Court found a joint venture to exist in *J. Roland Brady*, *supra*, despite the fact that no partnership returns had been filed. Other factors mentioned on behalf of petitioners are the lack of a joint bank account and the absence of any agreement between Emory, on the one hand, and Burde and Weiss, on the other, to share losses. These are some of the objective criteria which courts may look to in order to determine whether the requisite subjective intent to carry on a business venture as a partnership exists. The presence or absence of any one of these factors is not controlling, however. Moreover, by reference to other objective criteria hereinabove mentioned, we have found the requisite subjective intent did, in fact, exist. See *Flanders* v. *United States*, 172 F. Supp. 935, 944–945 (N.D. Cal. 1959). Also cf. *Cleveland* v. *Commissioner*, *supra*.

For the reasons hereinabove indicated, we conclude that a joint venture to develop and sell the bath oil formula existed between Emory, Burde, and Weiss. Whether or not a partnership or joint venture exists has been held upon numerous occasions to be a question of fact. By virtue of the conclusion we have reached herein, we do not mean to hold that all persons who agree to finance the development of an invention or patent are necessarily joint venturers with the inventor. Our finding concerning the existence of a joint venture between Emory,

Burde, and Weiss is based primarily upon the extent and nature of the activities performed by each of these three individuals in connection with the development of the bath oil invention.

Having decided that Emory, Burde, and Weiss held the bath oil invention as joint venturers prior to their transfer of said invention to the partnership, we, therefore, conclude that section 707(b) (2) (B) governs that transaction. (See fn. 7, *supra.*) Consequently, the gain realized by Burde and Weiss is to be considered as gain from the sale or exchange of property other than a capital asset.

In any event, even if section 707(b) (2) (B) were not applicable, the gain realized by Burde and Weiss, namely the royalty payments which the partnership agreed to pay them, would constitute short-term, rather than long-term, capital gain.

It is true that if the transfer of a patent or an invention qualifies under section 1235, long-term capital gains treatment will be obtained, even though the transferor does not possess the requisite 6-month holding period. We have previously decided that the transfer by Burde and Weiss did not qualify under section 1235. Therefore, their transfer of the bath oil invention is governed by other provisions of the law, and in order to qualify for long-term capital gains treatment on the royalty payments, they must have held property rights in the invention for more than 6 months prior to its sale. See *Franklin S. Speicher*, 28 T.C. 938, 945 (1957). See also *Carl G. Dreymann*, 11 T.C. 153, 163 (1948).

Burde and Weiss did not hold any property rights in the bath oil invention for more than 6 months prior to the time they conveyed their respective interests therein to the partnership. A property right in an original invention comes into existence when it is reduced to actual practice. *Samuel E. Diescher*, 36 B.T.A. 732 (1937), affd. 110 F. 2d 90 (C.A. 3, 1940), certiorari denied 310 U.S. 650 (1940). The term "actual reduction to practice" is defined in section 1.1235–2(e), Income Tax Regs., as having—

the same meaning as it does under section 102(g) of title 35 of the United States Code. Generally, an invention is reduced to actual practice when it has been tested and operated successfully under operating conditions. This may occur either before or after application for a patent but cannot occur later than the earliest time that commercial exploitation of the invention occurs.

Clear and uncontroverted testimony was introduced in behalf of petitioners that the bath oil formula had not been successfully tested under operating conditions until sometime during the first week of January 1955. Emory, the inventor of the bath oil, continually emphasized during his testimony at the trial that even though test tube samples of the formula had been prepared during August and September 1954, he could not tell whether the product would be commercially feasible until a large commercial batch of the product had been

prepared and laboratory tests had been conducted thereon. He stated that until tests were made on a large commercial batch it could not be determined how well the product would stand up from the standpoint of shelf life, effectiveness, and consistency. When asked when the first commercial exploitation of the product occurred, Emory replied, "January 6, 1955." Prior to that time no laboratory tests or commercial tests of any kind had been conducted on the bath oil. We, therefore, conclude that the bath oil had not been reduced to practice until, at the earliest, January 6, 1955. Thus, whether we regard the transfer of the bath oil invention from Emory, Burde, and Weiss to the partnership (1) to have occurred (pursuant to their oral agreement of January 2, 1955) on January 6, 1955, when the invention was reduced to practice (see *Carl G. Dreymann, supra* at 159) or (2) to have occurred on May 31, 1955, when their oral agreement was reduced to writing, Burde and Weiss did not hold property rights in the bath oil invention for more than 6 months prior to the time they disposed of such rights.

*Decisions will be entered for the respondent.*